### IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Receipt number AUSFCC-8339408

| | |
|---|---|
| Center for Excellence in Higher Education, Inc. | |
| Plaintiff, | Case No: _22-1732 C_____ |
| v. | |
| The United States of America | **Complaint** |
| Defendant. | |

Plaintiff, Center for Excellence in Higher Education, Inc. ("CEHE"), brings this action against the United States of America seeking damages and other relief based on the United States Department of Education's ("Department's") (1) breach of an escrow agreement by which the Department held CEHE's funds; (2) breach of its fiduciary duties owed to CEHE as the holder of CEHE's escrowed funds; (3) breach of its contract with CEHE setting out the parties' rights and obligations with respect to CEHE's participation in federal student aid programs; (4) breach of the implied duties of good faith and fair dealing with respect to that contract; (5) illegal retention or taking of CEHE's funds for public use without compensation in violation of the Fifth Amendment; and (6) illegal exaction of CEHE's funds in contravention of applicable law. CEHE is an IRS-recognized 501(c)(3) organization, and the Department's unlawful actions caused substantial harm to CEHE and its nonprofit mission of improving higher education in the United States. This action seeks damages to restore CEHE's ability to continue its nonprofit objectives in the amount of the escrow funds currently held by the Department, the funds CEHE advanced to its students in expectation of the Department's legal obligation to reimburse CEHE for those funds, lost revenues, loss of business value, interest, and any other legal or equitable relief as the Court may deem just and proper. In support of this action, Plaintiff states and alleges the following:

1

## Introduction

1.    Private career education is the one of the oldest forms of education in the United States. Long before the nation's public educational system was developed, Benjamin Franklin became one of the first advocates of vocational education. He and other entrepreneurs operated small proprietary schools focused on teaching skills and trades such as surveying, navigation, bookkeeping, and technical drawing. Over the years, these private schools expanded to provide workforce training in business, administration, allied health, and other areas. They have been referred to by many names, including "trade schools," "proprietary schools," "vocational schools," and, as used in the Complaint, "career colleges."

2.    Career colleges have offered higher education and career opportunities to people who were unable to access the country's traditional colleges and universities. They played an instrumental role in opening up education to the more vulnerable and disadvantaged citizens of our communities.  While traditional schools offered longer bachelor's and more-advanced degrees to academically successful applicants, career colleges focused on career-focused programs directed at specific outcomes for students seeking entry to a specific job field.

3.    Today, career colleges continue to provide critical career training opportunities, often to members of disadvantaged communities underserved by traditional universities. Over a decade ago, proprietary career schools led the development of online education, which proved invaluable during the recent COVID pandemic. Proprietary career schools also led the way in innovating education suited to teaching adults by providing fully staffed placement offices for graduates, offering flexible schedules and evening programs, and focusing on hands-on career training with limited general education.

4. These efforts have proven effective. Notwithstanding their focus on training disadvantaged communities and students deemed unlikely to succeed in traditional educational settings, career colleges consistently outperform public institutions, such as community colleges. According to data from the Department's College Scorecard and Integrated Post-Secondary Data System ("IPEDS"), career colleges report similar graduation rates for bachelor's degree programs to those reported by public institutions (41.9% for career colleges and 47.8% for public institutions) and associate's degree graduation rates that more than double those at public institutions (61.2% for career colleges to 30.5% for public institutions).

5. Congress has recognized the value of these schools and the training they provide, and the Higher Education Act specifically authorizes their participation in Title IV student assistance programs equally with traditional colleges and universities. But Department leadership and ideological critics of the sector (including some members of Congress) disagree with Congress's decision to make federal aid available to proprietary institutions, and they have coordinated their efforts to eliminate proprietary schools in circumvention of legislative intent. Those critics have worked hard to link "for-profit" and "predatory" in the public's mind. As a result, one seldom sees a school referenced to as "for-profit" without the "predatory" modifier.

6. This class of professional critics moves seamlessly between government service, thinktanks, and private entities, and believes that the profit motive is inherently incompatible with higher education. For-profit critics have worked hard, consistent with their ideological bias towards public education, to close proprietary career schools, regardless of their compliance with Department requirements.

7. Department leadership, in coordination with these other entities, has developed tools that it improperly wields for this purpose:

a.   It imposes oppressive and disproportionate investigations based on spurious complaints.

b.   It pressures accreditors and other regulators to do the same.

c.   It selectively enforces financial responsibility requirements to force proprietary career schools to impose massive financial securities aimed at crippling the schools' ability to fund operations.

d.   And it changes payment methods to fatally restrict cash flows, guaranteeing closure.

8.     These tools have proven to be extraordinarily effective. Over 1,194 proprietary schools, consisting of thousands of branches and locations, have closed since 2011.

9.     Once the Department targets a school, there is almost no hope of staying open, regardless of the school's actual compliance with Department requirements.

10.    CEHE is one of those institutions. CEHE became a target when it acquired a group of proprietary career schools in 2012 with the goal of operating them as nonprofit colleges. CEHE operated successfully as an IRS-recognized 501(c)(3) nonprofit organization for years before it acquired the colleges through an arms-length merger. One of those colleges, Stevens-Henager College was founded in 1892. CEHE made the decision to acquire and operate the colleges as part of its nonprofit mission to promote excellence in higher education.

11.    Indeed, upon information and belief, just prior to the acquisition, Department officials were searching for ways to terminate CEHE's colleges from Title IV programs. The officials lamented the fact that the colleges had been found to be in compliance with Department requirements and openly hoped that the Department could generate findings aimed at putting the schools out of business.

12.     Given the animosity towards the profit motive, one would expect for-profit critics to support CEHE's efforts to operate the schools as nonprofits. As with other nonprofits, CEHE's revenues were devoted exclusively for nonprofit educational purposes, including making grants to other nonprofit institutions of higher education. From 2017 to 2021, those grants totaled approximately $7.9 million. But the Department and for-profit critics simply refused to let proprietary colleges shed the for-profit stigma they worked so hard to create.

13.     Rather, they opened their tool chest to wage a near decade long attack on CEHE, forcing its inevitable closure. First, the Department sought to cripple CEHE with a demand for a massive financial security it knew CEHE was incapable of providing. When that proved unsuccessful, the Department pressured and supported CEHE's accreditor, other federal agencies, and state regulators to inundate CEHE with costly and oppressive investigations tied to anonymous and uncorroborated smears against the institution. None of those smears ever proved to be meritorious. Finally, the Department succeeded in forcing closure by placing CEHE on what is known as heightened cash monitoring 2 ("HCM2") status—the most significant weapon in its arsenal for closing proprietary career schools. Once a school is on HCM2, it must advance all funding and seek reimbursement from the Department. Simply put, HCM2 bleeds schools while on the promise of future reimbursement that all too frequently is never made. Here, the Department promised to process CEHE's HCM2 submissions consistent with regulatory requirements, but it never intended to pay. Instead, it withheld over $50 million in funds rightly owed to CEHE with the intent of forcing CEHE's precipitous closure.

14.     The Department acted in bad faith and in violation of the program participation agreement ("PPA") by intentionally closing CEHE and even preventing CEHE from providing an orderly teach-out of its remaining students.

## Parties and Jurisdiction

15.     CEHE is a tax-exempt nonprofit corporation under Section 501(c)(3) of the Internal Revenue Code. The corporation exists and operates pursuant to the laws of Delaware.  Its principal place of business is P.O. Box 575777, Salt Lake City, Utah 84157.

16.      At the time of the acts for which CEHE seeks damages, it owned four institutions of higher education: Stevens-Henager College ("SHC"), d/b/a Independence University ("IU"), CollegeAmerica Denver, CollegeAmerica Arizona, and California College San Diego ("CCSD") (together, the "Colleges"). Each institution operated multiple campuses.

17.     All of CEHE's institutions participated in federal student aid programs under Title IV of the Higher Education Act ("Title IV" or "Title IV programs") by entering into a PPA with the Department.  The PPAs are the contracts between the Colleges and the Department with respect to the Colleges' participation in Title IV.  The PPAs for SHC and CCSD are attached as Exhibits 1 and 2. The Colleges were eligible to participate in Title IV programs prior to closure.

18.     A majority of the students attending the Colleges used Title IV programs to fund some or all of their education. Title IV programs include many different types of financial assistance.  The Colleges participated in the Federal Pell Grant Program, the Federal Supplemental Opportunity Grant Program, the Federal Work-Study Program, the Federal Family Education Loan Program, and the Federal Direct Loan Program.

19.     The Colleges exclusively offered career-focused degree programs, as opposed to shorter certificate programs.  SHC/IU offered master's level degree programs as well as bachelor's and associate's degree programs. CollegeAmerica and CCSD offered bachelor's and associate's degree programs.  Most of CEHE's students attended programs for careers in the healthcare

professions, such as Medical Assisting, Nursing, Health Services Management, and Respiratory Care.  The Colleges also offered business, accounting, and graphic arts degree programs.

20.     The Colleges, and their programs, were accredited and approved by the Accrediting Commission of Career Schools and Colleges ("ACCSC"). ACCSC is recognized by the Department as an independent accrediting agency. To be eligible to participate in Title IV programs, institutions must maintain accreditation from a Department-recognized accreditor.

21.     The Department is an executive agency of the United States Government.  It was created by the Department of Education Organization Act of 1979, 20 U.S.C. § 3401 *et seq*., Pub. L. No. 96-88, 93 Stat. 668. The Department is headquartered at 400 Maryland Avenue, S.W., Washington, D.C. 20202.

22.     This Court has subject matter jurisdiction under the Tucker Act, 28 U.S.C. § 1491, because this action is a claim for money damages founded on the Department's breaches of the Colleges' respective PPAs and an escrow agreement, which are both valid and enforceable contracts.

23.     Additionally, or in the alternative, subject matter jurisdiction under the Tucker Act, 28 U.S.C. § 1491, exists because this action is based upon the Department's illegal retention or taking of CEHE's money for public use in violation of the Fifth Amendment's Takings Clause.

24.     The Court also, or in the alternative, has subject matter jurisdiction under the Tucker Act, 28 U.S.C. § 1491, because this action seeks to remedy the Department's illegal exaction of funds it was required, by law, to reimburse CEHE for Title IV disbursements. CEHE disbursed those funds to students on the Department's behalf and at the Department's direction.

<u>**Factual Allegations in Support of Claims**</u>

**I.  The Department used its financial responsibility standards as a tool to extract, and then unlawfully retain, an intentionally oppressive financial security.**

   **a.  The Department and CEHE entered the Escrow Agreement, which set the terms by which the Department held CEHE's funds in escrow.**

25.     CEHE and the Department entered an escrow agreement on or about June 8, 2015 (Ex. 3, "**Escrow Agreement**"), in which CEHE agreed to post $42.9 million in three deposits of $14.3 million each, with the final payment to be made by December 31, 2015.  CEHE made all payments as required by the Escrow Agreement.

26.     The Escrow Agreement set the terms under which the Department would hold CEHE's funds in escrow. In exchange for continued authorization to participate in Title IV programs, CEHE agreed to post the escrow funds subject to the following conditions:

   a.  CEHE would provide the funds in three installment payments by certain deadlines. *Id.*

   b.  The Department would maintain the escrow funds on behalf of CEHE, and could only draw them down for one or more of three specified purposes: (1) to pay refunds of institutional or non-institutional charges owed to or on behalf of current or former students of the Colleges, whether the Colleges remained open or had closed; (2) to provide for the "teach-out" of students enrolled at the time of the closure of the Colleges; and (3) to pay liabilities owing to the Secretary arising from acts or omissions by the Colleges before the expiration of the Escrow Agreement, for violations of any agreement entered into by the Colleges with the Secretary regarding the administration of programs under Title IV of the HEA. *Id.*

c.  The Department was required to provide notice to CEHE whenever any of the escrow funds were used, and it would identify the amount of funds used and how they were applied. *Id.*

27.     The Escrow Agreement allowed the Department to hold the funds until December 31, 2016, unless the Department "notified [CEHE] in advance of a scheduled expiration date [] the basis for the Department to require the Agreement to be extended for another year." *Id.*

28.     But, as discussed below, the Department failed to honor the terms of the Escrow Agreement. At first, the Department created specious reasons to extend the term of the Escrow Agreement.  Then, it simply ignored CEHE's requests for return of the funds.

**b.  The Department manufactured pretextual reasons to extend the term of the Escrow Agreement.**

29.     The Department failed to return the escrow funds on or after the December 31, 2016 expiration date, despite providing no advance notice that it would extend the term of the Escrow Agreement.

30.     The Department's stated reason for the escrow requirement was because CEHE's "composite score," a financial ratio used to assess an institution's compliance with financial responsibility requirements, fell below the Department's minimum standard. Ex. 4 at 1 (January 26, 2015 letter from the Department demanding letter of credit). CEHE's low composite score stemmed from the debt and goodwill it assumed as part of the financing of a transaction in which CEHE merged with the Colleges on December 31, 2012.

31.     When the Escrow Agreement expired on December 31, 2016 pursuant to its original terms, CEHE's composite score exceeded the Department's minimum standard.

32.     CEHE notified the Department in a letter dated January 3, 2017 that the Escrow Agreement, by its terms, had expired on December 31, 2016. Ex. 5 (January 3, 2017 letter from CEHE seeking return of escrow funds).

33.     But the Department refused to return CEHE's funds.  Instead, in a January 9, 2017 letter, the Department said it would not release the funds, based on an improper November 22, 2016 citation for a late audit submission. Ex. 6 (January 9, 2017 letter from the Department denying CEHE's request to release escrow funds).

34.     The citation stemmed from CEHE's purportedly late submission of its financial audit for the fiscal year ending ("FYE") December 31, 2015.

35.     In fact, CEHE had timely submitted its FYE 2015 financial audit. Nonetheless, to create a basis to assert it was late, the Department contended that CEHE's failure to include a statement regarding compliance with the 90/10 rule—a regulation applicable only to for-profit entities and having no bearing on timeliness—rendered the submission untimely.[1]

36.     When CEHE submitted its FYE 2015 financial audits without the 90/10 calculation, it had reasonable grounds to believe that the calculation was not required because the Colleges were in fact nonprofit entities for purposes of participating in Title IV programs.

37.     Just before CEHE acquired the Colleges, the Department expressly told CEHE that the Colleges would become nonprofit institutions and would only have to comply with the 90/10 requirement for the first fiscal year after the merger, FYE 2013. Ex. 7 at 2 (December 20, 2012 pre-acquisition review letter). As instructed, CEHE submitted its FYE 2012 and FYE 2013 audited financial statements with an attestation confirming compliance with 90/10 requirements. CEHE

---

[1] The 90/10 rule requires a proprietary institution to derive at least ten percent of its revenue from non-federal sources. 20 USC 1094(a)(24).

submitted its FYE 2014 audited financial statements without a 90/10 attestation based on its understanding that the Colleges were nonprofit institutions. The Department accepted that audit without issue.  Approximately a year later, CEHE submitted its FYE 2015 audited financial statements, which were also prepared under nonprofit requirements.

38.     But in November 2016 the Department deviated from its prior guidance and course of dealing with CEHE and denied as untimely CEHE's 2015 financial statements because they failed to include a demonstration of 90/10 compliance. CEHE promptly remedied the issue after being notified of the citation and submitted an amended audited financial statement in December 2016 demonstrating compliance with 90/10 requirements.

39.     By way of background, the Colleges became nonprofit institutions when CEHE acquired them through a December 31, 2012 merger.

40.     The College's former owner, Carl Barney, was in the process of retiring at the time of the merger. The Colleges would remain as Mr. Barney's legacy, and it was important to him that they continue, in perpetuity, to deliver high-quality and high-caring education to career-focused learners.

41.     Prior to the merger, CEHE availed itself of the Department's pre-acquisition review process to receive guidance on any issues or Department requirements that might create impediments to the proposed transaction.

42.     The pre-acquisition review process is important because the Department requires institutions to submit the formal application for approval of a change of ownership or control after the event has occurred.  The process is intended to alert the parties to the transaction to problems or conditions that might cause them to abandon the transaction entirely.

43.     The pre-acquisition review process was particularly important to CEHE because it understood that the merger would cause the Colleges' conversion from proprietary to nonprofit status by virtue of being owned and operated by a CEHE, an IRS-recognized 501(c)(3) tax-exempt nonprofit organization.  As discussed above, only proprietary institutions must comply with the 90/10 requirements. CEHE needed to know if the Department intended to deviate from its long-standing practice of deferring to the IRS's nonprofit determination.

44.     Additionally, CEHE recognized that the debt it would incur to finance the transaction would cause its composite score to fall below the Department's minimum standard. When an institution's composite score falls below Department standards, the institution may be required to provide financial security as a condition of continued Title IV eligibility. Upon information and belief, the Department's standard practice was to require institutions with low composite scores to post a letter of credit in the amount of ten percent of the Title IV funds distributed in the prior year. CEHE was prepared to meet that requirement, but it needed to be sure that the Department did not intend to deviate from its standard practice by requiring a more oppressive financial guarantee that might prevent the Colleges from meeting their operational expenses.

45.     Accordingly, CEHE prospectively asked the Department during pre-acquisition review whether the Colleges' conversion to nonprofit status would impact its Title IV eligibility and whether the Department would require CEHE to post a letter of credit exceeding ten percent. Ex.  8 at 3-4 (October 2, 2012 letter from CEHE to the Department requesting pre-acquisition review).

46.     After requesting, and receiving, substantial documentation regarding the terms and structure of the transaction, the Department notified CEHE in a letter dated December 12, 2012

that it had completed its pre-acquisition review.  Ex. 7. The Department expressly stated that it did "not perceive any impediment to the issuance of a Temporary [PPA] upon completion of the sale transaction," and gave no indication that it intended to deviate from its prior practice of requiring a ten percent letter of credit.  *Id.* at 2. The Department also recognized that the transaction would cause "a change in structure for the institutions from proprietary to private not-for-profit." *Id.* The Department told CEHE that it would have to report a 90/10 calculation for the transitional year, FYE 2013, which CEHE did. *Id.* That followed the Department's own guidance to institutions regarding nonprofit conversion. *See* Department of Education, *Federal Student Aid Handbook*, Vol. 2, Ch. 5, p. 2-65 (August 2015) ("A school that converts from a for-profit to a nonprofit status must report its compliance with the 90/10 revenue test for the **first year** after its conversion.") (emphasis added). The Department also offered no indication that it intended to deviate from its prior practice of requiring a ten percent letter of credit. *See* Ex. 7.

47.     CEHE relied on the Department's express guidance and openly operated the Colleges as nonprofit institutions.  But years after the transaction, the Department deviated from its guidance in two ways.  First, it required CEHE to post a financial security that far exceeded ten percent.   Then, it revoked its express recognition of the Colleges as nonprofit institutions and, without notice, retroactively imposed 90/10 requirements as a basis to keep the funds, without providing any opportunity to remedy or cure the issues that supposedly justified the extraordinary retroactive steps taken by the Department.

48.     With respect to the former, the Department waited until over two years after the merger and, in a letter dated January 26, 2015, demanded a fully collateralized letter of credit in the amount of $71,600,000, **representing 50%** of the Title IV funds distributed by the Colleges in the previous financial aid award year. Ex. 4 at 2. The Department's demand from CEHE was

unprecedented and greatly exceeded what the Department had previously required from other institutions that underwent a conversion from for-profit to nonprofit. Moreover, CEHE's FYE 2013 audited financial statements, which the Department had reviewed, showed that CEHE had less than $10 million in cash to put up as a financial security—nowhere near the amount demanded by the Department. Thus, the Department knew CEHE did not have the funds to meet the letter of credit demand. Only after an intervention by the Utah Congressional delegation on CEHE's behalf did the Department agree to meet with CEHE to negotiate a reduction of the demand to $42.9 million, which CEHE provided to the Department pursuant to the terms of the Escrow Agreement.

49. CEHE had to immediately implement a drastic restructuring of its operations for the remainder of 2015 in order to satisfy the Department's escrow requirements. During that process, CEHE was also able to negotiate a significant reduction in its outstanding debt, which enabled CEHE to satisfy the Department's financial responsibility composite score standard for FYE 2015 and for each year going forward.

50. Then, in a decision dated August 11, 2016—44 months after the merger—the Department issued a decision announcing its refusal to recognize the Colleges' nonprofit status. More alarmingly, the Department told CEHE that the Colleges had never been recognized by the Department as nonprofit institutions.

51. The Department's sudden and unexplained deviation from its prior guidance with respect to both the escrow requirements and the College's nonprofit status created immense and improper burdens on CEHE. Nonetheless, CEHE was able to post the escrow funds, rehabilitate its composite score, and demonstrate 90/10 compliance almost immediately after the Department retroactively imposed those requirements. In other words, at the time the Escrow Agreement expired, CEHE had complied with all Department requirements.

14

52.    But the Department refused to release $16,234,899 of the escrow funds. Its sole basis to retain the funds was the purportedly late FYE 2015 audit submission. Based on that finding alone, the Department told CEHE that it was extending the term of the Escrow Agreement to December 31, 2020. Ex. 9 at 1-2 (November 13, 2017 letter from the Department).

53.    CEHE opted to allow the Department's modification of the Escrow Agreement because it was hopeful that the parties would be able to amicably resolve a lawsuit CEHE had filed challenging the Department's refusal to recognize CEHE's nonprofit status. The parties were eventually able to settle their dispute with regard to CEHE's nonprofit status, and on November 29, 2018 the Department issued a new decision in which it officially recognized the Colleges' nonprofit status.  However, the Department declined to withdraw its November 22, 2016 citation for CEHE's purportedly late FYE 2015 audit submission.

54.    In May 2020, CEHE sought confirmation from the Department that it intended to honor the modified December 31, 2020 expiration date. Ex. 10 (May 11, 2020 letter from CEHE). But the Department instead notified CEHE that it would again extend the term of the Escrow Agreement and demanded that CEHE increase the escrow funds by over $4.6 million. Ex. 11 (May 20, 2020 letter from the Department demanding additional escrow funds); Ex. 12 (May 20, 2020 letter from the Department extending term of escrow agreement).

55.    The Department erroneously claimed that, notwithstanding its prior promise to release the funds after December 31, 2020, its regulations precluded release of the funds until CEHE's FYE 2019 and FYE 2020 audited financial statements were submitted and accepted via the Departments eZ-Audit system. Ex. 12.

56.    Before providing the additional $4.6 million, CEHE required an express confirmation from the Department that it would release the escrow funds after submission of

CEHE's FYE 2019 and FYE 2020 audits, which it planned to submit in March 2021. Ex. 13 (May 26, 2020 letter from CEHE seeking confirmation of escrow release date).

57.     In a letter dated May 29, 2020, the Department expressly confirmed that it would release the funds no later than two weeks after the audits were submitted and accepted by the Department. Ex. 14 (May 29, 2020 letter from the Department confirming release date of escrow funds).

58.     In reliance on the Department's express confirmation, CEHE provided the additional $4.6 million in escrow funds, raising the total amount of CEHE's funds held in escrow to $20,877,279.

59.     CEHE timely submitted its FYE 2019 audit submission on May 21, 2020 and timely submitted its FYE 2020 audit submission on March 5, 2021.  Nonetheless, the Department refuses to release CEHE's escrow funds. The Department continues to hold over $20 million of CEHE's escrow funds in violation of the Escrow Agreement, as amended, and in breach of the Department's fiduciary duties to CEHE as holder of the escrow funds.

**c.  The Department's reversal of its pre-acquisition guidance followed political pressure from members of Congress, former Department officials, and thinktanks.**

60.     The Department's initial refusal to recognize CEHE's nonprofit status marked a stark deviation from its prior practices. Prior to CEHE's acquisition of the Colleges, the Department had always deferred to the IRS's 501(c)(3) determination, and it told CEHE during pre-acquisition review that the Colleges, too, would be recognized as nonprofit institutions.

61.     But following the transaction, a confederacy of for-profit critics refused to accept CEHE's motives and created the fiction of a "covert nonprofit."  Led by Senators, Representatives, and former Department officials, they directed the Department to reverse its guidance and take harsh action against CEHE.

62.     Those critics spent years vilifying proprietary career colleges, poisoning the label. Under the Department's long-standing practices, the Colleges lost that label when CEHE acquired them as nonprofit institutions. The ideologically driven critics refused to allow CEHE to shed the derogatory label they worked so hard to create.

63.     So began a concerted campaign to lobby the Department to weaponize its administrative powers to not only deny nonprofit recognition to the Colleges, but also to take punitive actions aimed at closing the institutions.

64.     For example, on April 27, 2015, several members of Congress wrote to the Department, pushing their political ideology against proprietary career education and demanding a moratorium on approving transactions where schools are purchased by nonprofit entities.

65.     Shortly thereafter, in September 2015, former Department Deputy Undersecretary, Robert Shireman, published an article baselessly attacking the motives of schools seeking to convert to a nonprofit model.  He similarly called for a complete moratorium on allowing schools to become nonprofit for Title IV purposes and, specifically, encouraged the Department to delay action on CEHE's change-in-ownership application. In his article, Mr. Shireman referenced conversations with the Department, which, upon information and belief, involved CEHE's nonprofit conversion.

66.     In response to congressional inquiries, then-current Undersecretary Ted Mitchell explained that the Department did not have authority to stop institutions from converting to nonprofit status, but it made referrals to the IRS "[w]here appropriate," for review of information received in the change-in-ownership application process. Ex. 15 (September 9, 2015 letter from Ted Mitchell).

67.     But for-profit critics continued to lobby the Department to prevent lawfully operated nonprofit institutions from shedding their former for-profit label, notwithstanding their compliance with IRS requirements.

68.     In an October 22, 2015 letter, citing only Robert Shireman's September 2015 article, several Senators, including Dick Durbin and Sherrod Brown, wrote to the Secretary and the Commissioner of the IRS demanding investigations into CEHE and other schools based on their nonprofit conversions.[2] Without citing any evidence of wrongdoing, the Senators maliciously called CEHE a "sham non-profit entit[y]."

69.     These congressmen and for-profit critics mischaracterized CEHE's conversion to nonprofit as an attempt to avoid proprietary requirements—specifically, the 90/10 rule and newly-announced gainful employment regulations, which were ultimately rescinded in 2019.

70.     But CEHE began the process of merging with the Colleges nearly a year before the Department began the gainful employment rule-making process. And those regulations did not become effective until July 1, 2015, two-and-a-half years <u>after</u> CEHE acquired the colleges. Moreover, as discussed above, CEHE demonstrated continued compliance with 90/10 four years after the merger when the Department reversed its pre-acquisition review guidance confirming that the Colleges would only have to meet that requirement for one year (FYE 2013). *See* ¶ 38, *supra*. Thus, there was no reasonable basis to conclude that the Colleges merged with CEHE to avoid proprietary requirements.

---

[2] The text of the Senators' letter can be viewed at:
https://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-murphy-colleagues-urge-obama-administration-to-take-immediate-action-to-stop-for-profit-education-companies-from-defrauding-taxpayers

71.     The truth is that CEHE acquired the Colleges as part of its nonprofit mission.  Since the merger, the Colleges' revenues have been devoted to operating the Colleges and advancing higher education in the United States. The IRS audited CEHE after the merger and made no findings that CEHE or the Colleges violated nonprofit requirements or that the merger was part of an effort to evade proprietary regulations.

72.     In reality, the improper motives rested with high-level Executive federal officials and other for-profit critics who sought to undo the Colleges' good-faith nonprofit conversion to ensure that CEHE would be subject to onerous regulations aimed at ultimately closing proprietary schools.

73.     Notably, around the time of negotiated rulemaking sessions for the gainful employment regulations in the fall of 2013, the President's Special Assistant for Education publicly acknowledged that the Administration "believe[s] [it] needs to cut [for-profits] out. . . of federal aid." Roberto J. Rodriguez, Conference on Student Loans – Opening Plenary Session (Oct. 24, 2013).  He affirmed that this was "the whole premise behind [the] regulation[s]." *Id.*

74.     The timing of the Department's actions with respect to the imposition of the oppressive escrow requirement and sudden reversal of its nonprofit recognition evidenced the Department's intent to use the administrative process in bad faith to close CEHE while retaining the improperly extracted escrow funds.

**II. The Department weaponized its reimbursement payment method as a tool to cut off the Colleges' funding and maximize liabilities against CEHE.**

   **a. The reimbursement payment method is a powerful tool because it gives the Department near complete control over a school's cash flow.**

75.     The Department provides three distinct payment methods by which colleges and universities may access Title IV funds.

76.     Under the first method, colleges may draw down funds from the Department before disbursing the funds to its students. This is referred to as the advance payment method.

77.     The second method—referred to as the just-in-time method, Heightened Cash Monitoring 1, or just HCM1—requires colleges to disburse their own funds to eligible students and submit related disbursement records for verification through the Department's Common Origination and Disbursement System ("COD") before it can draw down Title IV funds to cover the disbursements. This process is similar to the advance payment method. Colleges subject to the HCM1 method may draw down funds from the Department once its document submission is completed, without material interruption to their cash flows.

78.     The final method is known as Heightened Cash Monitoring 2, or HCM2. Under HCM2, colleges are required to first make disbursements to students for the amount of funds those students are eligible to receive under Title IV by issuing a credit on a student's account ledger. Once disbursed, the institution must provide additional records to the Department to support the disbursement. The Department is obligated to review these records and reimburse the institution the amount advanced to the students and must pay the institution for all amounts that are properly disbursed to all eligible students enrolled in eligible programs.

79.     Prompt reimbursement from the Department is vitally important to a school on HCM2 status. Until the Department processes an HCM2 reimbursement request, an institution on HCM2 must continue to meet operational expenses with little to no income stream. In other words, the Department can completely cut off a school's funding. Under normal processing time, an institution on HCM2 must fund at least 30 days of operations. But if the Department refuses to promptly process HCM2 reimbursement requests, it is only a matter of time before an institution

will be forced to close. Upon information and belief, the Department has used the HCM2 process in bad faith to force the closure of various nonprofit institutions.

    **b. After failing to close CEHE with its oppressive escrow requirement, the Department looked to other regulators to provide pretext to put CEHE on HCM2 status.**

80.    The Department needed a reason to put CEHE on HCM2 status, but CEHE complied with Department requirements.  Instead, the Department turned to outside authorities to generate a pretextual basis to cut off CEHE's funding.

81.    To that end, the Department and other for-profit critics relied on another effective tool used in closing proprietary career schools: pressuring accreditors of proprietary schools to take selective and disproportionate actions to create a basis for HCM2 and other sanctions.

82.    For example, in June 2016 (just two months before the Department denied CEHE's nonprofit recognition), the National Advisory Committee on Institutional Quality and Integrity ("NACIQI") recommended denying recognition for the Accrediting Council for Independent Colleges and Schools ("ACICS"), which was at that time the largest accreditor of proprietary schools. NACIQI is an independent body whose role is to make recommendations to the Department on recognition of accreditors.  Based on NACIQI's report, then-Secretary King issued a decision denying ACICS's recognition. The decision was predominantly driven by ACICS's alleged failures to sanction proprietary schools.

83.    In other words, the Department made it known that accreditors must heed the calls of for-profit critics or face loss of Department recognition—an effective "death sentence" to accreditors.

84.    CEHE's accreditor, ACCSC, and its executive director, Dr. Michale McComis, were subject to substantial scrutiny for their oversight of proprietary schools.  In fact, Dr. McComis testified in a Senate hearing in August 2010, in which he faced criticism from various Senators

about ACCSC's accreditation of proprietary schools. Of particular focus at the hearing was ACCSC's oversight of Westwood College, which was under investigation by the Colorado Attorney General ("COAG"). Following the hearing, in March 2012, Westwood entered a $4.5 million settlement agreement with COAG to resolve alleged violations of Colorado consumer protection laws.

85.     Against that backdrop, ACCSC and COAG worked side-by-side to push unnecessarily costly and burdensome investigations and proceedings aimed at finding any conceivable reason to take adverse action against CEHE and the Colleges. These actions were precipitated by the Department's improper influence over supposedly independent regulators to take unnecessarily punitive action against proprietary career schools.

### c.   ACCSC and Dr. McComis responded to pressure by imposing baseless and costly investigations.

#### 1.   Dr. McComis imposed a campaign of disproportionately oppressive and punitive information requests.

86.     Just months after Westwood's settlement with COAG, ACCSC received a series of anonymous smears consisting primarily of invective and missive against CEHE and its Colleges. ACCSC referred to these submissions as "complaints," but in reality they were nothing more than anonymous smears aimed at disparaging the Colleges. Rather than specific allegations about actual events, practices, or people, these anonymous smears were filled with insults such as "scummy," "corrupt," and "rip-off."

87.     Most of the smears involved CEHE's Good Neighbor Initiative, through which some of CEHE's campuses offered free tutoring to help people prepare for and pass the GED exam. The Good Neighbor Initiative helped many people obtain a valuable credential at no cost and without any obligation to enroll at a CEHE school. Yet in one of the smears, the author

classified these beneficial services as "a deceptive scheme to bring people in the door to do high pressure sales and enroll them into programs." Another called the program a "'scummy' tactic to lure students into the campus to enroll . . . [a]nother sleezy way for Mr. Carl Barney to take advantage of the uneducated!"

88.     The timing of the smears, and similarities in their format and content, strongly indicated common authorship and that they were a coordinated attempt to disparage CEHE and its Colleges. Almost all of them used the same formatting and font, and they all copied similar oversight agencies and media sources.

89.     To prevent such harassment and abuse of the accreditation process, ACCSC's Rules of Process and Procedure ("ACCSC Rules") state that complaints should contain all relevant names, dates, and a release from the complainant, authorizing ACCSC to forward the complaint to the school.  The ACCSC Rules also require ACCSC to reach out to the complainant if additional information or clarification is required to process a complaint.

90.     Despite the inherent unreliability of anonymous complaints and the strong indicia of coordination, upon information and belief, ACCSC never attempted to substantiate any of the allegations or to contact the authors of the smears.

91.     Instead, Dr. McComis added legitimacy to the series of anonymous smears. ACCSC used the weight of its authority to issue a series of disproportionately costly and oppressive document requests, requiring CEHE to respond to each allegation.

92.     CEHE comprehensively responded to each and every allegation and information request to the best of its ability given the paucity of factual detail in the anonymous smears.  But ACCSC refused to close the matter and instead continued to defer action and demand numerous reiterative responses. CEHE's later responses asked ACCSC for consideration about the harm

these demands were causing, pointing out the lack of verifiable facts or details corroborating the anonymous smears. Yet each time ACCSC met to consider CEHE's various responses, it ordered additional requests for information without identifying any basis to assign legitimacy to any of the anonymous allegations.

93.    Even though none of the smears were ever substantiated, ACCSC issued a system-wide show cause order on July 12, 2013, asking why CEHE's accreditation should not be withdrawn based on the allegations in the anonymous smears.

94.    A system-wide show cause order put the existence of the Colleges at risk and was an obviously disproportionate response to anonymous allegations that remained unsubstantiated after substantial investigations. Upon information and belief, the show cause order was intended to be punitive.

95.    Ultimately, following CEHE's submissions totaling thousands of pages of narrative and documents, the show cause order was vacated in December 2013 and every anonymous smear was closed without any action from ACCSC.

96.    Worse still, throughout ACCSC's disproportionate and burdensome investigation, Dr. McComis fed the anonymous smears to for-profit critics in various state Attorneys General offices and possibly to other regulatory agencies before even allowing CEHE an opportunity to respond. In doing so, Dr. McComis often opted not to provide CEHE's responses. His apparent refusal to provide the thousands of pages of exculpatory evidence legitimized the anonymous smears, which ACCSC ultimately deemed unworthy of any action.

### 2.    ACCSC and Dr. McComis refused to accept accountability for the harm caused by its disproportionate response to anonymous complaints.

97.    In responding to the show cause order, CEHE was critical of ACCSC's handling of anonymous smears and efforts to disparage CEHE to other regulators. CEHE was deeply

concerned that ACCSC accepted unsubstantiated anonymous smears at face value against a member institution and used them to force oppressive document requests and instigate government investigations. CEHE's criticism of Dr. McComis's handling of the anonymous smears, which were all dismissed without any findings, created conflict and animus that permeated Dr. McComis's treatment of the Colleges.

98.     That animus continued after CEHE's then-Chairman, Carl Barney, filed a formal complaint against ACCSC, its staff, and Commissioners for violating ACCSC's Standards of Accreditation regarding the handling of and processing of complaints and Department regulations requiring fair and equitable review of complaints. But ACCSC dismissed the complaint, ignoring the regulatory requirements that accreditors review complaints in a "timely, fair, and equitable manner." 34 CFR 602.23(c)(1). Instead, ACCSC asserted it had unfettered discretion to investigate complaints without respect to the reliability of the allegations or the financial and operational burden imposed on the school.

99.     But that is a false and dangerous assertion of authority.  Department regulations require accreditors to review complaints in a "timely, fair, and equitable manner."  34 CFR 602.23(c)(1). ACCSC violated those requirements by refusing to consider the massive financial and operational burdens caused by its investigations.

### 3.  Over the next three years, ACCSC continued to heavily scrutinize CEHE's advertising, recruiting, and outcome reporting processes.

100.     Even though CEHE had demonstrated that every anonymous smear was meritless and part of a coordinated campaign to disparage the school, ACCSC continued to legitimatize them.

101.     ACCSC placed CEHE's colleges on advertising and outcomes reporting, requiring detailed reviews of CEHE's marketing, outcomes, and reporting practices.

102.    Throughout the reporting process, CEHE provided all requested information to ACCSC.  When ACCSC identified any concerns with CEHE's practices, CEHE resolved them to ACCSC's satisfaction through the accreditation process. Often, these findings were highly subjective. Nevertheless, CEHE deferred to ACCSC's authority and made requested modifications as necessary.

**d.  Olivia DeBlasio Webster, then an assistant AG in the COAG's office, coordinated with ACCSC to bring an eight-year assault on CEHE's Colorado schools based on legal and widely used advertising practices.[3]**

**1.  Fueled with the anonymous smears forwarded by ACCSC, Ms. Webster launched her own duplicative investigation into CEHE's marketing and recruiting practices.**

103.    Ms. Webster was an Assistant Attorney General in COAG's office. She had previously targeted career colleges and other proprietary schools. In the summer of 2012, she found an ally in Dr. McComis, who had already begun his campaign of punitive document requests against CEHE.

104.    After speaking with Dr. McComis the week prior, COAG's office sent ACCSC a letter requesting materials related to CEHE's Colorado-based schools. Without notifying CEHE, ACCSC responded and forwarded all of the anonymous smears, including communications regarding Colleges outside Colorado, before CEHE had an opportunity to respond. In doing so, ACCSC added legitimacy to the apparently coordinated anonymous allegations.

105.    Instead of engaging in reasonable dialogue to resolve the obviously coordinated and unfounded smears, Webster served two subpoenas in December 2012 and September 2013, consisting of a combined ninety document requests, relating to nearly every aspect of CEHE's

---

[3] In December 2021, Student Defense, a so-called non-partisan student advocacy organization hired Ms. Webster as senior counsel.  Student Defense has been a leading critic of for-profit education since its inception in 2017.

admissions, financial aid, advertising, and recruiting practices. Over the course of approximately 15 months, CEHE produced over 46,000 pages of documents. COAG also took testimony at 20 civil investigative hearings.

106.    Just as with ACCSC, CEHE was fully transparent and cooperated with COAG's investigation in good faith.

### 2.  COAG sought preliminary injunctions against CEHE's Colorado schools, which were denied.

107.    After two years of investigation, COAG tried to persuade CEHE to enter into a settlement agreement requiring a substantial payment. But CEHE believed it had done nothing wrong and refused to settle. So, in December 2014 COAG initiated a lawsuit alleging violations of Colorado's Consumer Protection Act ("CCPA") and the Colorado Uniform Consumer Credit Code, claiming that CEHE's marketing and advertising practices misled students.[4]

108.    COAG's case focused primarily on CEHE's use of federal wage data from the Bureau of Labor Statistics ("BLS"). But the Department expressly condoned the use of national wage data in advertisements and consumer-facing materials for the time period at issue in the Colorado litigation (December 2009 to October 2017). In 2010, the Department confirmed that accurate use of government data—like BLS statistics—was not misleading. 75 Fed. Reg. 66832, 66919 (Oct. 29, 2010). The Department again confirmed in 2014 that it was reasonable for institutions to use BLS data for "consumer information purposes." 79 Fed. Reg. 64889, 64942 (Oct. 31, 2014). And, more recently, the Department recognized that "BLS data is helpful because a student is generally interested in earnings over the course of a career, and not just a few years after completion of the program." 84 Fed. Reg. 49788, 49810 (Sept. 23, 2019).  CEHE, like

---

[4] That case, brought in the District Court for the City and County of Denver, was captioned *State of Colorado, et. al v. Center for Excellence in Higher Education, et al.*, Case No. 14CV34530.

hundreds of other nonprofit, public, and proprietary institutions, relied on the Department's repeated acknowledgement that schools using BLS statistics were safe from misrepresentation claims.

109.    At the outset of the litigation, COAG sought 21 preliminary injunctions. After a five-day hearing, the court denied all 21. The judge who presided over that preceding found that CEHE's admissions practices were designed to provide detailed disclosures and prevent misinformation. Moreover, at the hearing he recognized that the Colleges had "a place in our community" and commented that he detected a "bias against these types of schools as opposed to traditional schools." Ex. 16 (Excerpts from May 8, 2015 hearing on Motion for Preliminary Injunctions).

### 3. Dr. McComis undermined CEHE's attempt to resolve the litigation following the favorable preliminary injunction rulings.

110.    After the ruling on the preliminary injunctions, CEHE met with the Colorado Attorney General, Cynthia Coffman, in an effort to resolve the pending claims.

111.    But Dr. McComis had written a misleading and inflammatory letter to CEHE, which he had shared with the Colorado Attorney General. In that letter, Dr. McComis disingenuously represented the history of anonymous smears to portray them as ongoing compliance issues.

112.    Dr. McComis revealed his bias and hostility towards CEHE when he gave the letter to the Colorado Attorney General without explaining that CEHE had responded to each and every allegation raised in the anonymous smears and that every single one was dismissed without any adverse action.

113.     CEHE's Member and Chairman, Carl Barney, sent the letter to several other ACCSC school owners and leaders, who also wrote letters to Dr. McComis expressing their concerns over his efforts to spur the Colorado litigation.

114.     Throughout the litigation, COAG misrepresented ACCSC's oversight of CEHE's marketing and recruiting practices, claiming that CEHE improperly evaded ACCSC oversight. In fact, ACCSC closely and contemporaneously monitored CEHE's advertising, admissions, and outcomes reporting practices and took no action against any of CEHE's schools. Dr. McComis observed COAG's misrepresentations of ACCSC oversight practices and characterization of actions ACCSC might have taken, yet he never sought to correct the gross errors in COAG's legal theories.

### 4.  COAG proceeds to trial under newly assigned Judge Ross Buchanan.

115.     Emboldened by Dr. McComis's disingenuous characterizations of the anonymous smears, COAG litigated its claims in a four-week trial in late 2017.

116.     Notably, after years of investigation, including 20 civil investigative hearings, and a trial involving 366 exhibits and 48 witnesses, COAG provided no evidence of consumer confusion related to CEHE's advertisements. On the contrary, one of COAG's student witnesses testified that he understood the BLS data represented national averages for the program in which he enrolled and that it did not represent CEHE-specific wage data.[5]

---

[5] Notably, COAG relied heavily on expert testimony from Rohit Chopra to establish that CEHE's advertisements were misleading.  Mr. Chopra was the student-loan ombudsman at the Consumer Financial Protection Bureau and has been a leading opponent of proprietary career education.

**5. Judge Buchanan's nearly three-year delay in issuing an opinion led to gross legal and procedural errors.**

117.    Judge Buchanan was dilatory in his consideration of the case and delayed issuing a ruling for almost three years.

118.    CEHE eventually filed complaints with the Colorado Commission on Judicial Discipline ("CCJD") expressing concern over the extreme delay.  In response to the complaints, CCJD twice admonished Judge Buchanan for his delay and eventually set a hearing to consider appropriate action.  On the eve of the August 21, 2021 hearing, at 4:46 a.m., Judge Buchanan finally issued his opinion.

119.    What is more, Judge Buchanan's opinion copied nearly word-for-word COAG's proposed findings of fact, including typos. Those proposed findings of fact obviously reflect the State's preferred assessment of its own case, not an objective and impartial view.

120.    As a result, Judge Buchanan adopted plainly erroneous legal arguments and ignored critical evidence regarding the Department's own policies regarding use of BLS data. For example, Judge Buchanan imposed personal liability on CEHE's CEO for alleged misrepresentations that occurred *before* he was employed by CEHE. Nor did Judge Buchanan credit the fact that ACCSC reviewed the advertising, enrollment, and employment reporting practices at issue and found no wrongdoing. These errors would have been readily apparent had Judge Buchanan actually considered the trial record instead of copying, nearly verbatim, COAG's proposed findings.

**6. The Colorado Court of Appeals vindicated CEHE in reversing and remanding Judge Buchanan's erroneous findings.**

121.    CEHE appealed Judge Buchanan's decision to the Colorado Court of Appeals.

122.    The Court of Appeals found that COAG failed to prove any violation of consumer protection laws. Specifically, the court concluded that there was no evidence that CEHE's

advertising practices actually misled any students. The court vacated the CCPA findings and remanded the matter for a new trial.

123.   Moreover, the court took the extraordinary measure of removing Judge Buchanan from the case based, in part, on his inexplicable delay and misconduct in copying COAG's findings of fact.

124.   The COAG appealed the Colorado Court of Appeals' decision to the Colorado Supreme Court, where the matter is currently under review. CEHE remains confident in the Colorado judiciary as the Supreme Court considers the well-reasoned opinion of the Colorado Court of Appeals.

**e.   Following Judge Buchanan's erroneous ruling, for-profit critics mobilized to close CEHE based on the Colorado verdict.**

125.   Unfortunately for CEHE, Judge Buchanan's obviously deficient decision provided all the pretext the for-profit critics (inside and outside of the Department) needed to fulfill their goal of closing the Colleges by any means necessary. Even though CEHE timely sought appeal of the decision, which was ultimately successful, for-profit critics immediately called for the Department to take immediate action to cut off CEHE's funding. From that point on, the Department and ACCSC (under pressure from the Department) both worked to close CEHE and the Colleges.

**1.   Despite Judge Buchanan's decision being marred by procedural deficiencies and obvious factual and legal errors, members of Congress and think tanks demanded CEHE's closure before it had an opportunity to appeal.**

126.    As soon as Judge Buchanan issued his verdict, for-profit critics mobilized to lobby the Department to take immediate action to close the Colleges, notwithstanding the pendency of CEHE's expedited appeal.

127.    For example, in October 2020, a self-identified leading critic of proprietary career education, David Halperin, sent a letter to the Department demanding immediate cessation of Title IV funding to CEHE's colleges.

128.    One month later, Senator Dick Durbin sent a letter to the Department demanding that CEHE be barred from Title IV funding without waiting for the appeal and conclusion of the COAG litigation. He accused the Department of "failing in [its] responsibility [by] allow[ing] CEHE to continue to defraud students and Mr. Barney and [CEHE's CEO] to line their pockets with taxpayer money during a lengthy appeal process." Notably, that "lengthy appeals process" resulted in reversal of the verdict. Ex. 17 at 2.

129.    For-profit critics were also pressuring ACCSC to take premature action against CEHE. ACCSC's application for continued recognition by the Department was scheduled for consideration at NACIQI's July 2021 meeting. At that time, leading for-profit critic Robert Shireman served on NACIQI's committee, and he had already written articles critical of CEHE and the Colleges, as noted above. *See, e.g.,* ¶ 65, *supra*. For-profit critics at NACIQI and the Department had already acted to close ACICS based on its oversight of proprietary schools, and they had made it clear that ACCSC's recognition was in jeopardy if it did not mirror the Department's ideological agenda against career colleges.

130.    Moreover, the marketing, admissions, and reporting practices at the center of Judge Buchanan's later-vacated decision were the same as those ACCSC closely monitored following

the series of anonymous smears and show cause order. As discussed above, ACCSC found no cause to take adverse action based on those practices.

131.    In a transparent attempt to deflect criticism in light of the upcoming NACIQI meeting, and in a letter dated October 26, 2020, ACCSC threatened to withdraw CEHE's accreditation based on Judge Buchanan's findings.

132.    In a January 22, 2021 letter, CEHE addressed each of ACCSC's stated concerns and included documentation of each instance where CEHE contemporaneously informed ACCSC of the advertising, recruiting, and reporting practices at issue and each instance where ACCSC accepted (and often commended) CEHE for those same practices.

## 2. Unable to close CEHE based on Judge Buchanan's findings, ACCSC manufactured a withdrawal action based on findings it knew had already been addressed through an approved corrective action plan.

133.    ACCSC could not reasonably dispute that CEHE's practices, found problematic by Judge Buchanan, complied with ACCSC Standards.

134.    Instead, just a month later at its February 2021 meeting, ACCSC suddenly acted to withdraw CEHE's accreditation on the pretextual basis that CEHE's online college, IU, was incapable of producing sufficient graduation and employment outcomes.  Those findings are pretextual in that ACCSC confirmed in prior communications that CEHE had already implemented a corrective action plan, which ACCSC had approved, and demonstrated that current students were progressing through their programs and were on track to find employment at acceptable rates.

135.    The withdrawal decision followed a two-year period of substantial reorganization and investment in the Colleges.  In September 2018, ACCSC concluded that several of the Colleges were out of compliance with multiple ACCSC Standards, including those involving student graduation and employment rates, and placed CEHE on probationary status.

33

136.    At that time CEHE had already begun substantial efforts to identify the root causes of, and solutions for, the issues leading to probation. Those efforts involved a plan to close all but one of CEHE's traditional ground-based schools in order to focus its efforts on its online programs, offered through IU.

137.    Both ACCSC and CEHE understood that it would take several years for CEHE to report above-benchmark graduation rates. That is because CEHE offered primarily 20- to 36-month degree programs. A reporting cohort does not become reportable until one-and-a-half times the length of the program. Thus, if a cohort started today, CEHE would not know if that cohort graduated at benchmark rates for 30 to 54 months, depending on the program. For reference, most ACCSC member schools offer short-term degree programs, which can be completed in a matter of months and are often reportable within a year. CEHE's programs were more substantial, consistent with traditional college programs.

138.    CEHE's shift to primarily online programs also presented challenges to meeting ACCSC outcomes requirements. Due to the lack of in-person interaction and social engagements, fully online programs tend to have difficulty retaining students through the completion of their programs.  Leading online universities often report graduation rates that are substantially below the ACCSC benchmark, which, for CEHE's 24- to 36-month degrees programs, is 40 percent.[6] Those schools' accreditors do not have standards that require online programs to meet graduation benchmarks more appropriate for traditional ground-based programs. Conversely, ACCSC does not have separate Standards for online institutions.

_____

[6] For example, Purdue University Global's eight-year graduation rate is 30%, Maryland Global Campus's is 28%, and Liberty University's is 34%.
https://collegescorecard.ed.gov/school/?489779-Purdue-University-Global,
https://collegescorecard.ed.gov/school/?163204-University-of-Maryland-Global-Campus,
https://collegescorecard.ed.gov/school/?232557-Liberty-University.

139.    As part of its shift to a fully online model, CEHE devoted roughly $10 million to study and implement effective initiatives to improve student outcomes. Over its two-year probationary period, CEHE consistently updated ACCSC about the status of those initiatives, and ACCSC consistently acknowledged and commended those efforts. In a July 21, 2020 Continued Probation letter—the last review of CEHE's efforts before it abruptly withdrew accreditation—ACCSC recognized the breadth of CEHE's recently implemented initiatives to improve graduation rates and acknowledged that CEHE's online programs would not report benchmark graduation rates for several years. Accordingly, it gave CEHE until May 2021 to show that its efforts were capable of producing benchmark outcomes. ACCSC was clear that progress would be measured based on the success of the recently enrolled cohorts, who were the first to receive the benefits of the new initiatives.

140.    In its subsequent December 20, 2020 response, CEHE provided ACCSC updated projections for its most recently enrolled cohorts, which showed that CEHE's efforts had succeeded. The recently enrolled cohorts were on track to meet or exceed benchmark rates. This was a tremendous achievement for an institution that offered 100% online programs.

141.    But at its February 2021 meeting, ACCSC prematurely withdrew CEHE's accreditation. Had ACCSC allowed CEHE until May 2021 to show continued improvement (as previously promised), CEHE would have shown that most programs tracked to meet benchmarks ahead of the projections set forth in the December 20, 2020 Response. The precipitous withdrawal decision, which was published on April 22, 2021, was based entirely on older cohorts, which ACCSC always knew would not graduate at benchmark rates. That change in position contradicted its prior acknowledgments that progress would be measured based on the most recently enrolled

cohorts. Thus, it appears ACCSC's premature decision was an effort to prevent CEHE from further demonstrating progress.

142.     CEHE subsequently learned from limited, publicly available ACCSC accreditation decisions that other schools were permitted to remain accredited even though they failed to meet student achievement benchmarks in all of their programs. Moreover, those decisions noted the institutions' failures to demonstrate any ability to resolve the underlying issues. ACCSC's treatment of those schools stood in stark contrast to treatment of IU, which demonstrated that all of its programs were projected to meet or exceed benchmarks.

143.     Moreover, around the time of the withdrawal, ACCSC announced that it would offer relief from strict enforcement of student achievement Standards in the wake of the COVID-19 pandemic.  ACCSC noted that its Standards "contemplate [the] very notion" that COVID-19 is an "external or mitigating factor[]" that would be taken into consideration in assessing an institution's compliance with achievement Standards.[7] But where ACCSC offered relief to other institutions, it offered none to CEHE. In fact, ACCSC cut CEHE's demonstrably successful efforts short in the middle of the pandemic.

144.     ACCSC compounded its due process failures when Dr. McComis blocked CEHE from producing any evidence of disparate treatment during the internal ACCSC appeals process. To maintain federal recognition, accreditors must have "effective controls against the inconsistent application of [their] standards." 34 C.F.R. § 602.18(b). CEHE asked Dr. McComis to provide redacted records evidencing its treatment of other institutions with similar outcomes issues and institutions who sought relief from ACCSC enforcement due to the effects of the COVID-19 pandemic.

---

[7] https://www.accsc.org/UploadedDocuments/1956/COVID-19-QandA.pdf (Pg. 20 of 22)

145.     However, Dr. McComis refused to provide any such records, citing confidentiality concerns of other schools.  That response ignored the fact that CEHE specifically requested redacted records specifically to alleviate any confidentiality concerns.

146.     Thus, Dr. McComis ensured that the appeals process only included records supportive of ACCSC and excluded records that may have demonstrated that CEHE was singled out to appease NACIQI, the Department, and other for-profit critics.

147.     ACCSC's withdrawal decision appeared to be a calculated attempt at self-preservation in advance of the NACIQI meeting at the expense of the due process and fundamental fairness requirements to which CEHE was entitled.

**f.  The Department used the withdrawal decision in bad faith as a basis to cut off all funding to CEHE and force closure.**

148.     After years of defending itself against improperly motivated investigations, politically driven enforcement efforts, and constant attack from for-profit critics, CEHE had no alternative but to start the process of closing the Colleges and begin exploring other ways of tackling the problems facing higher education. It stopped enrolling students on April 22, 2021.

149.     CEHE was committed to its students and sought to ensure that the closure would not disrupt the completion of their programs. Accordingly, CEHE began the process of teaching out its remaining students and identifying other universities to serve as "teach-out" partners that could help students complete their programs without additional time or cost to the students.

150.     But the Department prevented CEHE from an orderly closure by withholding critical Title IV funding through the HCM2 process and by undermining CEHE's efforts to find teach-out partners. Upon information and belief, the Department did not just want CEHE to close, it wanted to impose the maximum possible liabilities by forcing a precipitous closure. Under Department regulations, when a school closes, currently enrolled students and students who

withdraw within a certain period before the closure (generally, 120 to 180 days prior) become eligible for full discharges of their federal loans ("closed-school discharges"). 34 C.F.R. 685.214. As the Department reads its regulations, it can then seek full reimbursement for those discharges from the closed school. Upon information and belief, forcing maximum closed-school discharges against proprietary schools was a primary component of the Department's "targeted loan forgiveness" goals.

151.    Before CEHE had an opportunity to appeal the ACCSC withdrawal decision, the Department sent SHC and CCSD letters on April 28, 2021 advising both institutions that they were placed on HCM2, pursuant to 34 CFR § 668.162(d), effective April 23, 2021. ("HCM2 letters"). Ex. 18 and 19. They explained that the action was taken because ACCSC had withdrawn SHC's and CCSD's accreditation.  Ex. 18 at 1; Ex. 19 at 1.

152.    Both HCM2 letters were eleven pages total. Pages 4 through 11 were instructions for obtaining funds under HCM2 ("Instructions"). Also included with the HCM2 letters were a sample Student Data Spreadsheet for use in preparing and submitting HCM2 payment claims as well as a Claim Processing User Guide for Schools ("Guide").

153.    The Instructions indicate that an institution of higher education "must demonstrate that it properly determined, awarded, and used its own funds to make disbursements under [Title IV] programs to eligible students who are enrolled in and are attending eligible programs. When the institution has demonstrated that it has expended these funds in accordance with Title IV requirements, [DOE] **will reimburse** the institution…" *Id.* at 4. (emphasis added).

154.     The Instructions also set the documentation requirements for reimbursement, including, but not limited to: student Social Security Numbers, street addresses, telephone numbers, instructional programs, enrollment status, admission criteria used for enrollment, credit

hours, start dates, cost of attendance, expected family contributions, certification of satisfactory academic progress, grade point averages, award amount requested, as well as records demonstrating students were eligible to receive Title IV awards, that the awards were properly calculated, and the institutions disbursed the awards. *Id*. at 6-7.

155.    The HCM2 Notice letters repeated and confirmed the Department's obligation.  In those letters, the Department promised: "Under the HCM2 method of payment, [CEHE] may continue to obligate funds under the federal student financial assistance programs…[CEHE] may disburse institutional funds to eligible students. If [CEHE] disburses institutional funds, [DOE] **will reimburse** it for properly documented expenditures." (emphasis added). *Id.* at 1.

156.    By operation of being placed on HCM2, the Colleges could no longer draw down funds after making disbursements on behalf of students.  Instead, the Colleges were required to submit a payment request to the Department through its COD system and wait for approval for payment.

157.    The Colleges were required to upload specified documentation to the COD system to establish that the students included in the request were eligible and received the funds for which reimbursement was requested.  The submissions included student files the Department selected for its quality control sampling purposes. 34 C.F.R. § 668.162(d)(2).

158.    The Department's April 28, 2021, HCM2 notice letters confirmed that the normal processing time for a reimbursement request is "thirty (30) days from the date the claim is received." Ex. 18 at 10; Ex. 19 at 10.

159.    As it turned out, however, CEHE had to fund its cash flow for considerably longer than 30 days without reimbursement from the Department.

160.     Among the costs CEHE had to front while on HCM2 were refunds of CEHE's own money to the Department. The HCM2 Instructions provided to CEHE required the institution to pay such refunds—often called return to Title IV payments or simply R2T4 payments.  Ex. 18 at 9; Ex. 19 at 9.  When the Department awards Title IV funds to a student, it is with the assumption that the student will attend his/her program for the entire period for which assistance is awarded. When a student ceases attendance prior to the planned ending date, the student may not be eligible for the full amount of Title IV funds the student received.  In such instances, the institution is required to return to the Department the "unearned" portion of the funds award for that period.  In this case, the Department required CEHE to pay the R2T4 refunds even though it never received the money in the first instance. Simply put, CEHE had to return to the Department federal funds it never received ("Phantom Refunds").

161.     Between April 28, 2021 and August 1, 2021, CEHE expended $43,185,396 to maintain operations. Over the same period, CEHE spent an additional $3,157,813 returning money to the Department in Phantom Refunds.

162.     To address the financial pressure HCM2 imposed, CEHE made substantial efforts to create a new operational and cash flow plan, including negotiating forbearances and deferrals with its landlords and creditors. Even then, CEHE's cash flow projections showed it running out of cash by the week of July 25, 2021, without reimbursement from the Department.

163.     Given these projections, CEHE worked diligently to provide the Department with all documents required in the HCM2 Notices, and it promptly responded to any additional document requests from the Department.

164. But contrary to the Department's regulations and express representations in the HCM2 Notices, the Department never reimbursed CEHE for any of its HCM2 reimbursement requests.

165. Indeed, CEHE almost immediately began encountering error messages and other indications of issues preventing it from uploading its HCM2 reimbursement claim submission for SHC through the COD system.

166. Despite numerous communications with Department staff about the problems with the COD system preventing CEHE's submissions, the Department did not admit until June 17, 2021 that its COD system had technical issues causing the system to reject HCM2 submissions for SHC. By that date, CEHE had been trying for 29 days, since May 19, to upload its first HCM2 submission for SHC.

167. CEHE first asked the Department to allow it to submit the HCM2 request for SHC/IU via an alternative method soon after its first effort on May 19. Exhibit 20 includes a June 1, 2021 7:57 a.m. email from CEHE's Director of Financial Aid asking whether there was any "any other option to submit up a claim other than COD? ... I want to make sure there is no other route to submit a claim." Ex. 20 at 44 (Emails between CEHE and DOE re: SHC HCM2 submissions).

168. It was not until June 17, 2021, that the Department finally instructed the Colleges to submit SHC HCM2 requests for payment by sending the information directly to the Multi-Regional and Foreign Schools Participation Division ("MRFSPD") using a secure portal as an alternative to submitting the claim through the COD system. Ex. 20 at 71.

169. CEHE submitted two HCM2 payment claims seeking reimbursement for funds SHC disbursed to students. The first HCM2 payment claim (Claim No. 4446) was submitted in

the amount of $16,513,575.24 and the second (Claim No. 4669) was submitted in the amount of $12,700,056.63.

170.    CEHE also submitted, without encountering any technical issues in the COD system, a single HCM2 payment claim for CCSD on May 25, 2021, in the amount of $82,737. The COD system processed this submission and assigned it Claim No. 4485.

171.    CEHE requested but never received from the Department an explanation for why the COD system accepted the CCSD payment claim but not the two SHC payment claims.

172.    Upon information and belief, CEHE was the only institution on the HCM2 disbursement method that was unable to submit reimbursement claims via the COD system in May and June 2021.

173.    Guidance provided by the Department, including in its Federal Student Aid Handbook, confirms that when the Department determines from reviewing an HCM2 submission that a school has correctly paid all its students, the Department will approve the request.  But even if the submission contains errors, the submission "will be approved for those disbursements which had no mistakes." U.S. Dept. of Educ., Federal Student Aid Handbook, Vol. 4, Ch. 4 at 4-15 (August 2020); 34 C.F.R. 668.162(d).

174.    Despite this guidance, the Department never paid any portion of the HCM2 payment claims CEHE submitted.

175.    Moreover, the Department instructed CEHE not to submit additional HCM2 claims until the initial submissions were reviewed, approved, and paid. As a result, CEHE could not submit additional HCM2 claims totaling $9,680,513 for SHC and $135,030 for CCSD.

176.    In total, CEHE disbursed $43,185,396 with the good-faith expectation that the Department would reimburse CEHE and that it would do so within a reasonable timeframe.

177.    But upon information and belief, the Department never intended to reimburse CEHE for the Title IV disbursements CEHE advanced to students on behalf of the Department. This belief is evidence by the Department's delays in responding to and resolving technical issues that prevented CEHE from submitting its claims through the COD system, imposing burdensome document requests that were irrelevant to the reimbursement claims at issue, and failure to timely review documentation CEHE submitted.

178.    Aware that it could not continue to operate indefinitely without timely reimbursement from the Department for funds it had disbursed to students, CEHE developed a Teach-Out Plan outlining the steps necessary to enable CEHE's students to complete their programs.

179.    CEHE's Teach-Out Plan included written agreements between SHC/IU and two regionally accredited universities that participated in Title IV programs. Those agreements would have allowed for most of SHC/IU's students to transfer and complete their programs. Under the agreements, the cost to complete the program would have been the same as if the students had completed their program at SHC/IU.

180.    To be effective, the agreements required SHC/IU to remain open and provide instruction through August 1, 2021. After August 1, SHC/IU would be required to provide transition services until August 18, 2021. These services related primarily to efforts facilitating the transfer of students from SHC/IU to the two universities.

181.    However, the Department refused to approve the teach-out agreements. In fact, the Department simply ignored CEHE's request for approval without providing any feedback or basis for withholding consideration. Rather than work with CEHE to ensure that students could complete their programs, Federal Student Aid Chief Operating Officer Richard Cordray instead used social

media to actively encourage students not to complete their education and instead seek loan discharges at the expense of CEHE and taxpayers

182.    On July 22, 2021, CEHE notified the Department that it would be unable to meet its ongoing expenses if the Department did not process the reimbursement requests or release a portion of the escrow funds. Exhibit 21. One of the express purposes of the Escrow Agreement is to fund an orderly teach-out before closure. Ex. 3 at 2; Ex. 9 at 4.

183.    At that time, the Department held over $20 million to which CEHE had an unequivocal right under the Escrow Agreement. CEHE only asked for a small portion of that money to ensure that CEHE could meet its obligations under the PPA to provide educational services to students and to make sure that they could complete their programs or find alternatives through a teach out agreement with another school. That was vitally important because many of CEHE's students relied on Title IV funds to pay for not only their tuition, but also rent, food, childcare, transportation, and other living expenses while they worked towards their degrees.

184.    But instead of working with CEHE in good faith to ensure an orderly closure that would minimize student hardship, on July 26, 2021 the Department notified CEHE that it was denying all HCM2 reimbursement requests.

185.    The Department rejected the claim submissions, in total, because CEHE's supporting documentation accompanying its reimbursement request did not include certain documentation that was irrelevant to whether disbursements to students were appropriate. By way of example, the Department cited CEHE's failure to produce student attendance records, not simply for the term in which the disbursements were made, but for the student's entire enrollment, including past terms for which the Department had previously disbursed funds to the student. The Department's regulations are clear that the CEHE only had to provide documentation showing

each student included in the request was "[e]ligible to receive and has received the title IV, HEA program funds **for which reimbursement is sought**." 34 C.F.R. § 668.162(c)(3) (emphasis added).

186.    The Department later clarified in a July 28, 2021 email that "[t]he documentation included with the rejected HCM2 claim did not show that the student was in attendance to confirm participation in an academically-related activity in conjunction with the exact time spent in class each day for all courses within the term." Ex. 22.

187.    The HCM2 instructions stated that the Department would consult with CEHE, during the submission process, regarding the scope of the required attendance documentation.

188.    The Department's requirement exceeded its authority in at least two ways. First, as noted above, there is no requirement that attendance records must cover the entire enrollment for each student. Second, the requirement to provide records to track "the exact time spent in class each day for all courses in a term" is not appropriate for a credit-hour, *i.e.*, non-clock hour school like IU or CCSD. Thus, the non-payment of CEHE's prior HCM2 reimbursement claims on the basis of the attendance records indicates the Department's desire to manufacture pretext to deny CEHE's reimbursement requests.

189.    After depleting its cash reserves and following the Department's rejection of the reimbursement claims, CEHE could no longer continue to operate the Colleges. CEHE announced the closure of SHC/IU and CCSD on August 1, 2021.

190.    Nearly 10,000 students had to discontinue their educational programs and over 1,000 employees were laid off. Many students immediately lost access to critical funding that they relied on for basic living expenses. That could have been avoided if DOE had not intentionally acted to close the schools.

191.    Upon information and belief, the Department never intended to reimburse CEHE for the Title IV disbursements it advanced to students and the Department's stated reasons for rejecting CEHE's submissions were mere pretexts to close the Colleges.

192.    Indeed, while CEHE made efforts to resubmit its claims with the additional documentation the Department had referenced in its rejection letter, the Department deleted all claim information CEHE had previously uploaded into the COD system, forcing CEHE to restart the submission process from the beginning, which involved many hours of manual data entry. In short, CEHE would have to re-create supporting records and documentation that had taken months to upload into the COD system, but this time after closing the Colleges, after depleting its cash reserves, and without an adequate income stream. Later, during an August 25, 2021 telephone call, the COD School Relations Center informed CEHE's staff that it was not the Department's normal process to delete records.

193.    The Department also obstructed CEHE's resubmission in other ways beyond deleting its supporting claim information. It terminated CEHE's access to the COD system, which took weeks to restore. The Department also informed CEHE that technical constraints with its COD system prevented submission of large batch claims. So CEHE would have to manually re-enter those records, involving thousands of students, which the Department had deleted.

194.    Finally, during a September 14, 2021 telephone call between CEHE staff and the Department, an employee of the Department recognized that the need to re-create and re-submit records in the COD system would impose substantial burdens on CEHE as it would have to reconcile its substantial records within the COD system. Although the employee proposed to his supervisors that the Department could assist CEHE with the re-submission of its deleted records

to avoid those reconciliation problems, the Department flatly refused. The employee also expressed surprise that the Department deleted the records from the initial submissions.

195.    This combination of factors prevented CEHE from resubmitting its claim for HCM2 reimbursement with additional supporting documentation. In any event, resubmitting the claims was futile. The Department apparently had no intention of reimbursing CEHE for funds it properly disbursed even with the additional documentation.

196.    Beyond the technical constraints the Department imposed, the Department informed CEHE by letter on August 4, 2021 that it would not release any HCM2 funds until all potential liabilities, including closed-school discharges incurred because CEHE was forced to close, had been calculated, a process the Department anticipated would take up to three years to complete. Ex. 23 at 3-5.

197.    The Department's actions were the culmination of a playbook designed to force CEHE's precipitous closure and pave the way to impose massive closed-school discharge liabilities in the future. As a federal agency, the Department must act in good faith when dealing with Title IV participants. However, in recent years the Department has run off the rails and exercised its authority in bad faith to destroy career education in America, contrary to the will of Congress. It had demanded that accreditors take harsh and unnecessarily punitive actions against career schools, and it has abused its financial responsibility and HCM2 processes to disrupt operations and force closure.

## Count I – Breach of Contract (PPA and HCM2 letters)

198.    Paragraphs 1 through 197 are fully incorporated as if fully stated herein.

199.    The PPAs are valid and enforceable contracts.

200.    The PPAs incorporates all Title IV regulations, including the requirement to reimburse HCM2 funds upon proof of student eligibility for the advanced funds.

201.    The HCM2 letters are also valid and enforceable contracts, which expressly provided that, if CEHE disbursed funds to students on the Department's behalf, the Department would reimburse CEHE for those funds upon proof of student eligibility for the advanced funds.

202.    CEHE advanced funds to students and subsequently provided sufficient proof of student eligibility, and the Department was bound to reimburse CEHE for those funds.

203.    The Department breached the PPA and the HCM2 letters by wrongfully and intentionally withholding HCM2 funds without a legitimate basis.

204.    The Department holds approximately $43,185,396 million dollars in funds that it was obligated to pay CEHE as reimbursement for Title IV funds disbursed to students on the Department's behalf.

205.    The Department knew or should have known its actions would cause CEHE to close.  CEHE notified the Department that it needed the Department to release HCM2 or escrow funds to keep the school operational until closure. The Department also knows that cutting off Title IV funding will lead to closure.

206.    The Department's breach of contract resulted in CEHE suffering substantial damages including, but not limited to, the amount of the withheld HCM2 funds, interest, and lost revenues CEHE would have earned had it not been forced by the Department to close.

### Count II – Breach of Contract (duty of good faith and fair dealing)

207.    Paragraphs 1 through 206 are fully incorporated as if fully restated herein.

208.    The PPAs are valid and enforceable contracts.

209.    The HCM2 letters are valid and enforceable contracts.

48

210.    All government contracts contain an implied covenant of good faith and fair dealing.

211.    The Department sought to deny CEHE the benefit of the PPAs and the HCM2 letters by acting in bad faith to take actions that would cause CEHE and its Colleges to close.

212.    Among other things, the Department knowingly and intentionally sought to generate pretextual reasons to close the Colleges and encouraged its accreditor and other regulators to do the same.

213.    The Department also wrongfully and intentionally withheld HCM2 funds with the intent of forcing closure and creating liabilities.

214.    Further, the Department wrongfully and intentionally prevented CEHE from entering teach-out agreements in order to prevent students from completing their programs, thereby creating closed-school discharges.

215.    The Department improperly influenced students to abandon their programs in order to create additional closed-school discharges, for which CEHE would be held liable.

216.    The Department knew or should have known its actions would cause CEHE to close.  CEHE notified the Department that it needed the Department to release HCM2 or escrow funds to keep the schools operational until closure. The Department also knows that cutting off Title IV funding will lead to closure.

217.    Upon information and belief, the Department acted in bad faith with the intent to harm CEHE and its Colleges.

218.    The Department's breach of its duties of good faith and fair dealing resulted in CEHE suffering substantial damages of at least $500,000,000, including, but not limited to, the

amount of the withheld HCM2 funds, interest, lost revenues CEHE would have earned had it not been forced by the Department to close, and the destruction of viable institutions.

### Count III – Breach of Contract (Escrow Agreement)

219.    Paragraphs 1 through 218 are fully incorporated as if fully restated herein.

220.    The Escrow Agreement, as modified by the Department in its letters dated January 9, 2017; November 13, 2017; May 20, 2020 (two letters); and May 29, 2020 (Exs. 6, 9, 11, 12, and 14, respectively), is a valid and enforceable contract.

221.    The actions of those with authority to bind the Department and the United States Government in requiring CEHE to post the escrow funds as financial security to the Department for potential liabilities constituted a clear and unambiguous offer to continue CEHE's Title IV participation in exchange for entering the Escrow Agreement.

222.    CEHE accepted the Department's offer when it signed the Escrow Agreement and posted the escrow funds.

223.    The Escrow Agreement is supported by valuable consideration from both parties. Among other things, CEHE was permitted to continue participating in Title IV programs.  The Department was granted limited access to valuable financial security, which mitigated any risk of loss to the Department that may have arisen from CEHE's participation in those programs.

224.    The Department induced CEHE to enter the contract by conditioning CEHE's and the Colleges' continued participation in Title IV on signing the Escrow Agreement and providing the necessary escrow funds.

225.    The Department's promise to release the escrow funds at a specified time was a material factor in CEHE's agreement to enter the Escrow Agreement as well as its agreements to allow the Department to modify the Escrow Agreement pursuant to the Department's letters dated

January 9, 2017; November 13, 2017; May 20, 2020 (two letters); and May 29, 2020 (Exs. 6, 9, 11, 12, and 14, respectively).

226.    CEHE performed its obligations under the Escrow Agreement by posting the escrow funds with the Department and by supplementing the escrow funds as was required by the Department from time to time.

227.    The Department breached the Escrow Agreement when it refused to return CEHE's funds following CEHE's FYE 2020 audit submission.

228.    Prior to the expiration of the Escrow Agreement, the Department failed to identify any legitimate basis for continuing to hold the escrow funds.

229.    The Department holds approximately $20,877,279 of CEHE's escrow funds, which CEHE provided to the Department to hold on CEHE's behalf, subject to the terms of the Escrow Agreement, as modified by the Department in its letters dated January 9, 2017; November 13, 2017; May 20, 2020 (two letters); and May 29, 2020 (Exs. 6, 9, 11, 12, and 14, respectively).

230.    Accordingly, the Department's breach has damaged CEHE in the amount of $20,877,279, plus interest, based on the Department's improper withholding of the escrow funds and CEHE's loss of use of the same.

## Count IV – Breach of Fiduciary Duty

231.    Paragraphs 1 through 230 are fully incorporated as if fully restated herein.

232.    A breach of fiduciary duty exists where (1) there is a fiduciary relationship between the plaintiff and defendant; (2) the defendant breached its fiduciary duty to the plaintiff; and (3) the defendant's breach results in injury to the plaintiff or benefit to the defendant.

233.    As holder of CEHE's escrow funds, the Department took on a fiduciary relationship with respect to CEHE's escrow funds.

234.    The Department's fiduciary duties included strict compliance with the terms of the Escrow Agreement.

235.    The Department breached its fiduciary duties to CEHE when it refused to return the escrow funds to CEHE upon the expiration of the Escrow Agreement.

236.    The Department holds approximately $20,877,279 of CEHE's escrow funds, which CEHE provided to the Department to hold on CEHE's behalf, subject to the terms of the Escrow Agreement, as modified by the Department in its letters dated January 9, 2017; November 13, 2017; May 20, 2020 (two letters); and May 29, 2020 (Exs. 6, 9, 11, 12, and 14, respectively).

237.    Accordingly, the Department's breach of its fiduciary duties has damaged CEHE in the amount of $20,877,279, plus interest, based on the Department's improper withholding of the escrow funds and CEHE's loss of use of the same.

238.    Moreover, the Department has impermissibly benefited from its breach of fiduciary duties by maintaining approximately $20,877,279 of CEHE's money, plus interest.

**Count V – Improper Taking Under the Fifth Amendment (Escrow Funds)**

239.    Paragraphs 1 through 238 are fully incorporated as if fully restated herein

240.    The Takings Clause of the Fifth Amendment of the Constitution precludes the government from taking a private property interest for public use without just compensation.

241.    CEHE has a private property interest in the escrow funds.

242.    The Department's sole basis for requiring CEHE to post the escrow funds was its authority under 20 U.S.C. § 1099c and the Department's implementing regulations, including 34 C.F.R. §§ 668.175(f), *et seq*.

243.    When CEHE timely submitted its FYE 2020 audit submission, the Department had no legitimate statutory, regulatory, or contractual basis to hold the escrow funds.

244.    By not releasing the escrow funds, the Department deprived CEHE of its property (or interfered with CEHE's property rights to an unlawful degree) in violation of the Takings Clause of the Fifth Amendment.

245.    Upon information and belief, the Department intends to use the escrow funds for what it considers to be the public benefit, including funding former students' closed-school discharges under 34 C.F.R. § 685.214, loan discharges pursuant to the borrower defense to repayment regulations under 34 C.F.R. § 685.206 and §685.222, and for use in the execution of other Department functions.

246.    The Department has not compensated CEHE for its taking of the escrow funds.

247.    The Department's unlawful taking of the escrow funds caused CEHE to lose approximately $20,877,279, plus interest.

### Count VI – Improper Taking Under the Fifth Amendment (HCM2 funds)

248.    Paragraphs 1 through 247 are fully incorporated as if fully restated herein.

249.    CEHE has a private property interest in the HCM2 funds, which the Department refused to reimburse to CEHE.

250.    When CEHE submitted sufficient documentation proving the students' eligibility for the funds CEHE disbursed, the Department had a statutory and regulatory obligation to reimburse CEHE for those funds. *See, e.g.*, 20 U.S.C. §§ 1070a; *Id.* at 1087b(c); *Id.* at 1226a-1; 34 C.F.R. § 668.162.

251.    By not reimbursing CEHE for the HCM2 funds, the Department deprived CEHE of its property (or interfered with CEHE's property rights to an unlawful degree) in violation of the Takings Clause of the Fifth Amendment.

252.    Upon information and belief, the Department intends to use the HCM2 funds for what it considers to be the public benefit, including funding former students' closed-school discharges under 34 C.F.R. § 685.214, loan discharges pursuant to the borrower defense to repayment regulations under 34 C.F.R. § 685.206 and §685.222, and for use in the execution of other Department functions.

253.    CEHE is entitled to just compensation for the taking of its property in the amount of the advanced funds, plus interest.

### Count VII – Illegal Exaction

254.    Paragraphs 1 through 253 are fully incorporated as if fully restated herein.

255.    When CEHE demonstrated that the students for which it advanced Title IV funds on behalf of the Department were eligible for those funds, the Department was required by law to reimburse CEHE for the funds. *See, e.g.*, 20 U.S.C. §§ 1070a; *Id.* at 1087b(c); *Id.* at 1226a-1; 34 C.F.R. § 668.162.

256.    The Department exceeded its authority by imposing documentation requirements for reimbursement that were irrelevant to students' eligibility for the specific funds advanced by CEHE.

257.    The Department also exceeded its authority by refusing to reimburse CEHE for funds advanced to students who were eligible to receive those funds.

258.    The Department compelled CEHE to bear the costs that the Department had a legal duty to bear.  Thus, the Department has in its pocket funds corresponding to the payments that were the Department's statutory and regulatory obligation.

259.    CEHE is entitled to recover the total amount of the HCM2 funds, plus interest.

## PRAYER FOR RELIEF

Plaintiff requests the following relief:

    a.      That the Court award Plaintiff the amount of the escrow and HCM2 funds held by the Department without legal justification.

    b.      That the Court award Plaintiff damages, in the amount of $500,000,000, for the destruction of the Colleges and lost revenues as a result of the Department's unlawful actions;

    c.      That the Court award pre-judgment and post-judgment interest at the maximum rate permitted under the law;

    d.      That the Court award such court costs, litigation expenses, and attorneys' fees as are available under applicable law; and

    e.      That the Court award such further and other legal or equitable relief as the Court deems just and proper.

Submitted on November 22, 2022, by

                      _____/s/ Steven M. Gombos_____
                      Steven M. Gombos (Lead Attorney)
                      David A. Obuchowicz (Of Counsel)
                      Gombos Leyton, PC
                      11350 Random Hills Road #400
                      Fairfax, Virginia 22030
                      Telephone: 703.934.2660
                      Facsimile: 703.934.9840
                      Email: sgombos@glpclaw.com
                              dobuchowicz@glpclaw.com
                      *Counsel for Center for Excellence in Higher Education*