No. 22-1732C
(Senior Judge Smith)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CENTER FOR EXCELLENCE IN HIGHER
EDUCATION, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S MOTION TO DISMISS THE COMPLAINT,
AND, IN THE ALTERNATIVE, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

ELIZABETH M. HOSFORD
Assistant Director

OF COUNSEL

STEVEN FINLEY
RAZIYA BRUMFIELD
Department of Education

JAMES W. POIRIER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tele:  202-598-7547
Fax:   202- 305-7644
james.poirier@usdoj.gov

March 24, 2023

Attorneys for Defendant

# <u>TABLE OF CONTENTS</u>

**Page**

SUMMARY OF THE ARGUMENT ...........................................................................2

STATEMENT OF THE ISSUES...............................................................................4

STATEMENT OF FACTS .........................................................................................5

    I     In 1980, Congress Consolidated Certain Eligibility Certifications .........................5

    II.    Since 1980, Congress Has Increased Education's Authority To Regulate Eligibility ..........................................................................................7

    III.   Education Issued Temporary Provisional Certification For Four Schools To CEHE ..................................................................................10

    IV.   Administrative Review Of CEHE's Application Continued Until December 2018 .......................................................................................12

    V.    Administrative Determinations Concerning Eligibility Continued After 2018 ................................................................................................16

ARGUMENT ...........................................................................................................21

    I.    Standard Of Review................................................................................21

    II.    CEHE's APA Claims Must Be Dismissed For Lack Of Jurisdiction ..................24

    III.   CEHE's Tort Claims Must Be Dismissed For Lack Of Jurisdiction ....................27

    IV.   CEHE's Purported Contract Claims Should Be Dismissed................................27

          A.    CEHE's Contract Claims Should Be Dismissed For Lack of Jurisdiction Because CEHE Has Failed To Identify Any Contract..........................................................................................29

               1.    Program Participation Agreements Are Not Contracts..................................................................................29

               2.    The 2015 Escrow Agreement Is Not A Contract ...........................32

          B.    CEHE Has Not Plausibly Alleged A Federal Contract.............................32

          C.    CEHE Cannot Establish A Genuine Issue Of Material Fact With Regard To All Four Necessary Elements Of A Federal Contract..........................................................................................35

    V.    CEHE Has Failed To State A Taking Claim .......................................................35

i

A.      CEHE Has Not Plausibly Alleged That Education's Failure
        To Repay The Financial Guarantee Is A Taking .......................................37

B.      CEHE Has Not Plausibly Alleged That Education's Failure
        To Pay HCM2 Funds Is A Taking ............................................................40

VI.     CEHE Has Failed To State An Illegal Exaction Claim .......................................41

VII.    CEHE Has Failed To Allege Any Violation Of Any Fiduciary
        Duty..................................................................................................................43

CONCLUSION..................................................................................................... 46

# **TABLE OF AUTHORITIES**

Cases                                                                                                          Page(s)

*Acceptance Insurance Companies, Inc. v. United States,*
    583 F.3d 849 (Fed. Cir. 2009).................................................................. 38

*Aerolineas Argentinas v. United States,*
    77 F.3d 1564 (Fed. Cir. 1996)................................................................. 41

*Air Pegasus of D.C., Inc. v. United States,*
    424 F.3d 1206 (Fed. Cir. 2005)............................................................... 36

*American Bankers Association v. United States,*
    932 F.3d 1375 (Fed. Cir. 2019)....................................................... *passim*

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986).............................................................................. 23

*Ark. Game & Fish Comm'n v. United States,*
    568 U.S. 23 (2012)................................................................................ 36

*Armstrong v. United States,*
    364 U.S. 40 (1960)................................................................................ 36

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007).............................................................................. 22

*Bench Creek Ranch, LLC v. United States,*
    149 Fed. Cl. 222 (2020) ........................................................................ 27

*Boeing Company v. United States,*
    968 F.3d 1371 (Fed. Cir. 2020)............................................................... 41

*Branch v. United States,*
    69 F.3d 1571 (Fed. Cir. 1995)..................................................... 37, 39, 41

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)....................................................................... 23,  35

*Central Virginia Community College v. Katz,*
    546 U.S. 356 (2006)............................................................................... 28

*Columbus Regional Hospital v. United States,*
    990 F.3d 1330 (Fed. Cir. 2021) ............................................................. 22

*Dynalectron Corp. v. United States,*
    4 Cl. Ct. 424 (1984) .............................................................................. 21

*Fidelity Construction Co. v. United States,*
   700 F.2d 1379 (Fed. Cir. 1983) ................................................................................ 21

*Lion Raisins, Inc. v. United States,*
   416 F.3d 1356 (Fed. Cir. 2005) ................................................................................ 39

*Love Terminal Partners, L.P. v. United States,*
   889 F.3d 1331 (Fed. Cir. 2018) ........................................................................ 36, 38

*Martinez v. United States,*
   333 F.3d 1295 (Fed. Cir. 2003) ................................................................................ 26

*McCutchen v. United States,*
   14 F.4th 1355 (Fed. Cir. 2021) ........................................................................ 22, 33

*McNutt v. Gen. Motors Acceptance Corp. of Ind.,*
   298 U.S. 178 (1936) ................................................................................................. 22

*Minkin v. Gibbons,*
   680 F.3d 1341 (Fed. Cir. 2012) ................................................................................ 23

*Newby v. United States,*
   57 Fed. Cl. 283 (2003) ............................................................................................. 44

*Portland Mint v. United States,*
   160 Fed. Cl. 642 (2022) ..................................................................................... 26,  37

*Reynolds v. Army & Air Force Exch. Serv.,*
   846 F.2d 746 (Fed. Cir. 1988) ........................................................................ *passim*

*Rith Energy, Inc. v. United States,*
   247 F.3d 1355 (Fed. Cir. 2001) ........................................................................ 39, 41

*Rochman v. United States,*
   27 Fed. Cl. 162 (1992) ............................................................................................. 22

*Rocky Mt. Helium, LLC v. United States,*
   841 F.3d 1320 (Fed. Cir. 2016) ................................................................................ 23

*San Juan City College, Inc. v. United States,*
   58 Fed. Cl. 26 (2003) ............................................................................................... 28

*San Juan City College, Inc. v. United States,*
   391 F.3d 1357 (Fed. Cir. 2004) ................................................................................ 28

*Scheuer v. Rhodes,*
   416 U.S. 232 (1974) ................................................................................................. 21

*Tellabs, Inc. v Maker Issues & Rights, Ltd.,*
   551 U.S. 308 (2007)..................................................................... 22

*United States v. King,*
   395 U.S. 1 (1969).......................................................................... 21

*United States v. Mitchell,*
   445 U.S. 535 (1980)...................................................... 21,  43, 44

*United States v. Mitchell,*
   463 U.S. 206 (1983)..................................................................... 43

*United States v. Sherwood,*
   312 U.S. 584 (1941)..................................................................... 21

*United States v. Testan,*
   424 U.S. 392 (1976)..................................................................... 21

## Statutes

5 U.S.C. § 706 ........................................................................... 3, 15

20 U.S.C. § 1001 ....................................................................... 24, 30

20 U.S.C. § 1002 ................................................................... 24, 29, 30

20 U.S.C. § 1018 ....................................................................... 30, 31

20 U.S.C. § 1018a ........................................................................... 31

20 U.S.C. § 1070a ........................................................................... 42

20 U.S.C. § 1094 ...................................................................... *passim*

20 U.S.C. § 1099c ..................................................................... *passim*

20 U.S.C. § 1226 ............................................................................ 42

28 U.S.C. § 1491 .................................................................. 27, 43, 44

## Regulations

34 C.F.R. § 68.15(b)(8) ........................................................................................... 12

34 C.F.R. § 668.26(c)(1) ......................................................................................... 20

34 C.F.R. § 668.162 ................................................................................................ 42

34 CFR § 668.171 ................................................................................................... 16

34 C.F.R. § 668.172 ................................................................................................ 12

34 C.F.R. § 668.175(f) ...................................................................................... 13, 16

34 C.F.R. § 668.175(h) ........................................................................................... 38

## Rules

RCFC 12(b)(1) ..................................................................................................... 1,  21

RCFC 12(b)(6) ................................................................................................. 1, 22, 28

RCFC 56 ......................................................................................................... 1, 23,  28

## Federal Register Notices

*Student Assistance General Provisions and Federal Pell Grant Program*,
 59 Fed. Reg. 9526 (February 29, 1994) ................................................................25

## Public Laws

National Defense Education Act of 1958,
 Pub. L. 85-864, § 204, 72 Stat. 1581 ................................................................. 5

Higher Education Act of 1965,
 Pub. L. 89, 79 Stat. 1219 § 401(b) .......................................................................27

Education Amendments of 1980,
 Pub. L. 96-374, § 487, 94 Stat. 1367 ................................................................. 6

**Public Laws**

Higher Education Amendments of 1992,
   Pub. L. 102 § 490, 106 Stat 448.................................................................................. 7


Higher Education Amendments of 1998,
   Pub. L. 105 § 493, 112 Stat 1581............................................................................. 10

<u>INDEX TO APPENDIX</u>

Page

1.    Complaint (without attachments), filed August 30, 2016,
In the United States District Court for the District of Utah ..................................... 1

2.    Temporary Provisional Program Participation Agreement,
Issued in January 2013 to Stevens Henager College................................................ 45

3.    Temporary Provisional Program Participation Agreement,
Issued in January 2013 to California College San Diego...................................... 63

4.    Temporary Provisional Program Participation Agreement,
Issued in January 2013 to CollegeAmerica Denver .............................................. 81

5.    Temporary Provisional Program Participation Agreement,
Issued in January 2013 to CollegeAmerica - Flagstaff ......................................... 99

.6    Provisional Program Participation Agreement,
Issued in December 2018 to Stevens Henager College........................................ 117

7.    Provisional Program Participation Agreement,
Issued in December 2018 to California College San Diego................................ 134

8.    Provisional Program Participation Agreement,
Issued in December 2018 to CollegeAmerica Denver ......................................... 151

9.    Provisional Program Participation Agreement,
Issued in December 2018 to CollegeAmerica - Flagstaff .................................... 168

10.   Exhibit 6 to Complaint, filed August 30, 2016,
In the United States District Court for the District of Utah ................................ 185

11.   Exhibit 11 to Complaint, filed August 30, 2016,
In the United States District Court for the District of Utah ................................ 189

12.   Exhibit 10 to Complaint, filed August 30, 2016,
In the United States District Court for the District of Utah ................................ 193

13.   Exhibit 9 to Complaint, filed August 30, 2016,
In the United States District Court for the District of Utah ................................ 198

INDEX TO APPENDIX
-continued-

Page

14.  Provisional Program Participation Agreement,
     Issued in May 2020 to College America Denver   ............................................. 210

15.  Provisional Program Participation Agreement,
     Issued in May 2020 to California College San Diego .......................................... 228

16.  Provisional Program Participation Agreement,
     Issued in May 2020 to CollegeAmerica - Flagstaff ............................................ 246

17.  Letter, from CEHE to Education,
     Dated September 21, 2021 ................................................................................... 264

18.  Declaration of Mr. Frola ...................................................................................... 284

19.  Declaration of Ms. Aiken ..................................................................................... 287

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CENTER FOR EXCELLENCE IN HIGHER EDUCATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 22-1732C |
| | ) | |
| THE UNITED STATES, | ) | (Senior Judge Smith) |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS THE COMPLAINT,
AND, IN THE ALTERNATIVE, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court dismiss all claims in the complaint filed by plaintiff, Center For Excellence In Higher Education, Inc. (CEHE), except the Fifth Amendment taking and illegal exaction claims, for lack of jurisdiction.  In the alternative, pursuant to RCFC 12(b)(6), we respectfully request that all such claims, and the Fifth Amendment taking and illegal exaction claims, be dismissed for failure to state a claim upon which relief might be granted.  In the alternative, pursuant to RCFC 56, we seek summary judgment with regard to all claims upon the grounds that CEHE cannot demonstrate evidence sufficient to raise a genuine issue of material fact with regard to each necessary element of any claim within the jurisdiction of the Court.

In support of our motions, we rely upon the complaint filed in this case (including documents attached by CEHE), a complaint filed by CEHE in the United States District Court for the District of Utah in 2016 (including certain documents attached by CEHE), four temporary provisional program participation agreements issued in 2013, four provisional program participation agreements issued in 2018, three provisional program participation agreements

issued in 2020, and one letter sent from CEHE to Education, dated September 21, 2020.  The district court complaint (including certain attachments), the 11 program eligibility certifications, and one letter, dated September 21, 2020, are set forth in the appendix.

## SUMMARY OF THE ARGUMENT

The Constitution of the United States gives Congress the power to authorize spending for the common defense and general welfare of the United States.  For several decades, Congress has exercised this power by authorizing spending to improve institutions of higher education, and to provide financial assistance to people studying at these schools.  Many of the spending authorizations have been published in Chapter 28 of Title 20 of the United States Code.

Congress has restricted certain spending to institutions meeting the regulatory definition of an "institution of higher education" who have entered into a program participation agreement, a provisional program participation agreement, or a temporary provisional program participation agreement with the Department of Education (and its predecessor agencies) ("Education").  These various types of eligibility certifications state the current conditions of eligibility established by statute or by Education for the institution to participate in certain spending programs.  By the plain meaning of the relevant statutes, Education retains regulatory authority over an institution's participation in those spending programs even after the certification is issued to an institution.

An eligibility certification is not a contract.  Congress did not intend for such agreements to be contracts.  No goods or services are acquired by such agreements.  No person with contracting authority signs such agreements on behalf of the United States.

In January 2013, CEHE submitted an application for four schools (recently acquired) to participate in spending programs as non-profit institutions of higher education.  From January

2013 through December 18, 2018, these four schools participated pursuant to four temporary provisional program participation agreements.  By statute, Education may issue such temporary certifications for up to 30 days, and Education may renew those certifications from month to month, while Education reviews the application submitted after a change in an institution's ownership control.

In 2015, pursuant to statutory authority to regulate participation in the spending programs, Education required CEHE to provide a financial guarantee as a condition for the four schools to continue participating pursuant to the temporary certifications.  CEHE complied with this regulatory determination by making deposits into an escrow account.

In August 2016, Education made an administrative decision denying CEHE's application for the four schools to have non-profit status, and Education offered CEHE four provisional program participation agreements.  CEHE immediately challenged Education's administrative decision in the United States District Court for the District of Utah.  Among other claims, CEHE challenged Education's decision (denying non-profit status to CEHE's schools for the purposes of the spending programs) upon the grounds that Education had violated the Administrative Procedures Act, 5 U.S.C. § 706 (APA).

In December 2018, the district court case was settled, and Education issued four provisional program participation agreements.  Each provisional certification recited that CEHE had failed to meet relevant financial standards, and each provisional certification recited that certain financial guarantees and payment methods were required as a condition for the institution to continue to participate.  By statute, each of the four certifications was subject to further regulatory action by Education.

In May 2020, Education issued three provisional program participation agreements to CEHE.  Again, each certification contained financial conditions.

CEHE now challenges various administrative actions taken by Education since December 31, 2012.  CEHE has labeled its challenges to administrative actions as contract claims, and seeks as damages:  (1) the return of approximately $21 million placed in an escrow account as a financial guarantee, (2) the payment of approximately $22 million currently claimed for payment ("HCM2 funds"), and (3) consequential damages "of at least $500,000,000."  Some of the purported contract claims sound in tort.  In the alternative, CEHE seeks repayment of its financial guarantee as a Fifth Amendment taking claim, and as a claim for breach of fiduciary duty.  In the alternative, CEHE seeks payment of HCM2 funds as a Fifth Amendment taking claim, and as an illegal exaction claim.  None of these labels bind the Court.  At most, CEHE may have alleged APA claims.  This Court lacks jurisdiction to consider APA claims.  The complaint should be dismissed.  In the alternative, the Court should enter summary judgment in favor of the United States.

<u>STATEMENT OF THE ISSUES</u>

1.      Whether CEHE's APA claims should be dismissed for lack of jurisdiction.

2.      Whether CEHE's tort claims should be dismissed for lack of jurisdiction.

3.      Whether CEHE's contract claims should be dismissed for lack of jurisdiction, or, alternatively, for failure to state a claim upon which relief may be granted, or, alternatively, whether the United States is entitled to summary judgment because CEHE cannot demonstrate a genuine issue of material fact with regard to every necessary element of a contract claim.

4.      Whether CEHE's Fifth Amendment taking claims should be dismissed for failure to state a claim upon which relief may be granted, or, alternatively, whether the United States is

entitled to summary judgment because CEHE cannot demonstrate a genuine issue of material

fact with regard to every necessary element of a Fifth Amendment taking claim.

5.       Whether CEHE's illegal exaction claim should be dismissed for failure to state a

claim upon which relief may be granted, or, alternatively, whether the United States is entitled to

summary judgment because CEHE cannot demonstrate a genuine issue of material fact with

regard to every necessary element of an illegal exaction claim.

6.       Whether CEHE's breach of fiduciary duty claim should be dismissed for lack of

jurisdiction, or, alternatively, for failure to state a claim upon which relief may be granted, or,

alternatively, whether the United States is entitled to summary judgment because CEHE cannot

demonstrate a genuine issue of material fact with regard to every necessary element of a breach

of fiduciary duty claim.

STATEMENT OF FACTS

I.    <u>In 1980, Congress Consolidated Certain Eligibility Certifications</u>

Since at least 1958, Congress has conditioned participation in certain spending programs

related to education after high school upon the participant's execution of an agreement stating

the conditions for eligibility to receive certain Federal spending.  *E.g.,* National Defense

Education Act of 1958, Pub. L. 85-864, § 204, 72 Stat. 1581, 1584 (requiring an agreement with

any institution of higher education seeking to be eligible for Federal contributions to the school's

student loan fund).  In 1980, Congress consolidated several similar statutory provisions from

various grant and loan programs into a single statutory provision:

> (a)  In order to be an eligible institution for the purposes of any
> program authorized under this title, an institution must be an
> institution of higher education or an eligible institution (as that
> term is defined for purposes of that program) and shall, except
> with respect to a program under subpart 3 of part A, enter into
> a program participation agreement with the Secretary.  The

agreement shall condition the initial and continued eligibility of an institution to participate in a program upon compliance with the following requirements:

(1)  The institution will use funds received by it for any program under this title solely for the purposes specified in, and in accordance with, the provisions of that program.

(2) In the case of an institution participating in any program authorized under subpart 2 of part A or Part C of this title for any fiscal year, the institution will continue to spend in its own scholarship and student aid program, from sources other than funds received under such parts, not less than the average expenditures per year made for that purpose during the most recent period of three fiscal years preceding the effective date of the program participation agreement, except that, under special and unusual circumstances prescribed by regulation, the Secretary is authorized to waive the requirements of this paragraph.

(3) The institution will establish and maintain such administrative and fiscal procedures and records as may be necessary to ensure proper and efficient administration of funds received from the Secretary or from students under this title.

(4) **The institution will comply with the provisions of subsection (b) of this section and the regulations prescribed under that subsection, relating to fiscal eligibility**.

(5) The institution will submit reports to the Secretary and, in the case of an institution participating in a program under part B or part E, to holders of loans made to the institution's students under such parts at such times and containing such information as the Secretary may reasonably require to carry out the purposes of this title.

(6) The institution will comply with the requirements of section 485 [concerning providing financial aid information to students].

Education Amendments of 1980, Pub. L. 96-374, § 487, 94 Stat. 1367, 1451 (1980 Act) (bold and brackets added), as amended, *codified at* 20 U.S.C. § 1094(a); *see* H. Rep. 96-520, at 42 (1979) ("a new section which requires all participating institutions to sign an agreement with the

Secretary to insure program integrity in administering Title IV programs thus reducing potential fraud and abuse.  This Section contains four subparts which have been consolidated from various provisions scattered through the existing Title IV.  These provisions are incorporated into this single section on "Institutional Eligibility.").  Subsection (b) of section 487 provided that Education would continuously monitor the financial responsibility and the administrative capacity of institutions issued program participation agreements, and Education would "limit, suspend or terminate" those program participation agreements, in accordance with regulations promulgated by Education.  1980 Act, § 487(b), as amended, *codified at* 20 U.S.C. § 1094(c).

II.    <u>Since 1980, Congress Has Increased Education's Authority To Regulate Eligibility</u>

Since 1980, section 1094 has been amended several times.  For example, in 1992, many new conditions to program eligibility were added to section 1094(a).  Higher Education Amendments of 1992, Pub. L. 102-325, § 490, 106 Stat 448 (1992) (1992 Act).

More significantly, in 1992, Congress enacted a related provision prescribing requirements for the application process for institutions seeking program participation agreements, prescribing time limits for such agreements, prescribing renewal applications at certain intervals, granting Education authority to require financial guarantees from institutions, and requiring new applications from institutions to be submitted for Education review and approval whenever there was a change in ownership control.  *Id.*, § 498, as amended, *codified at* 20 U.S.C. § 1099c.

The eligibility criteria detailed in section 498 of the 1992 Act followed the same general approach followed in earlier statutes – which had required eligible institutions to be approved by a State and by an accreditation agency (in the various statutory definitions of an institution of higher education, these features had been constant), and had required eligible institutions to meet

financial and administrative criteria established by Education.  In the 1992 Act, Congress

summarized these general requirements in paragraph (a), before setting forth further

requirements:

> (a)  GENERAL REQUIREMENT.  --  For purposes of qualifying
> institutions of higher education for participation in programs under
> this title, the Secretary shall determine the legal authority to
> operate within a State, the accreditation status, and the
> administrative and financial responsibility of an institution of
> higher education in accordance with the requirements of this
> section.

*Id.*, § 498(a).  Congress directed Education to develop a standard application form, and Congress

prescribed certain necessary information elements for that form.  *Id.*, § 498(b).  Congress

required Education to provide an identification number for each participating institution.  *Id.*,

§ 487B, *codified at* 20 U.S.C. § 1094b.  Congress required Education to conduct site visits before

making an eligibility "certification," and Congress authorized Education to charge institutions

who submitted applications reasonable fees to cover the expenses of eligibility certification and

site visits.  *Id.*, § 498(f).

Congress required Education to sunset existing program participation agreements, thus

requiring close monitoring periodically (when an institution seeking re-certification or approval

after a change of ownership was required to submit a new application).  *Id.*, § 498(g).  Congress

prescribed in more detail Education's obligation to review the financial condition of an

institution.  *Id.*, § 498(c).  Among other things, Congress authorized Education to require an

institution of higher education that failed to meet certain financial standards *to provide financial

guarantees* in order to establish or maintain program eligibility:

> (3)  The Secretary may determine an institution to be financially
> responsible, notwithstanding the institution's failure to meet the
> criteria under paragraphs (1) and (2), if –

> (A) such institution submits to the Secretary third-party financial
> guarantees, such as performance bonds or letters of credit payable
> to the Secretary, which third-party *financial guarantees shall equal*
> *not less than one-half of the annual potential liabilities of such*
> *institution to the Secretary for funds under this title*, including loan
> obligations discharged pursuant to section 437, and to students for
> refunds of institutional charges, including funds under this title;

*Id.*, § 498(c)(3)(A) (italics added).  Congress authorized Education to require financial

guarantees from the owners of institutions of higher education as a condition of eligibility for an

owned institution to participate in the programs.  *Id.*, § 498(e).

Congress also created a new category of program participation agreement:  a provisional

certification.  *Id.*, § 498(h).  One of the permitted reasons for Education to grant only provisional

eligibility was concern about the financial condition of the institution.  *Id.* ("(iii) the Secretary

determines that the institution is, in the judgment of the Secretary, in an administrative or

financial condition that may jeopardize its ability to perform its responsibilities under its

program participation agreement.").  Congress granted Education authority to terminate a

provisional program participation agreement without an administrative hearing (which is

otherwise required by section 1094(b) for terminating a program participation agreement).  *Id.*,

§ 498(h)(3).

Congress provided that a change in ownership control of an institution would

automatically terminate an institution's program eligibility.  *Id.*, § 498(i).  In order to continue

participation in any program following a change in ownership control, the institution would be

required to make a new application for a program participation agreement; and Education would

be required to conduct the necessary financial review, and other reviews, as part of the

certification determination required by statute.  *Id.*

In 1998, Congress created temporary provisional program agreements for institutions that had experienced a change in ownership control.  Higher Education Amendments of 1998, Pub. L. 105-244, § 493, 112 Stat 1581 (1998 Act) *codified at* 20 U.S.C. § 1099c(i)(4).

III.   <u>Education Issued Temporary Provisional Certification For Four Schools To CEHE</u>

On December 31, 2012, CEHE acquired four corporations operating institutions of higher education that were then eligible to participate in certain student aid programs:

(1) Stevens-Henager College, Inc., a Utah corporation,

(2) CollegeAmerica Denver, Inc., a Colorado corporation;

(3) CollegeAmerica Arizona, Inc., a Colorado corporation, and

(4) California College San Diego, Inc., a Utah corporation.

Complaint, ¶¶ 16-18, November 23, 2022, ECF No. 1; A4-6[1] (complaint filed by CEHE in 2016 in the United States District Court for the District of Utah) (identifying the four corporations, and the date of acquisition) (party admission).

In January 2013, Education issued to CEHE temporary provisional program participation agreements for each of the four schools:

> If the Institution provides the necessary documentation prior to the expiration of this Agreement, then the Secretary will extend the expiration date of this agreement on a month-to-month basis until a determination to the change in ownership is made on the application for approval of the change in ownership.
>
> If the Institution demonstrates that it meets the statutory and regulatory requirements for reinstatement to participation in the Title IV, HEA programs, then the Secretary will enter into a new Provisional Program Participation Agreement with the Institution.

---

[1]  "A" refers to the appendix to this motion.

A46, A64, A82, A100.  Each of the four temporary provisional program participation agreements were extended from month-to-month from January 2013 until December 19, 2018, when four provisional program participation agreements were issued.  A117-184 (2018 agreements).

Prior to the acquisition on December 31, 2012, the previous owner of the four schools (self-described as "CollegeAmerica") notified Education that CollegeAmerica understood that the acquisition would trigger regulatory review of the eligibility of the four schools, and that CollegeAmerica was committed to submitting the necessary applications:

> CollegeAmerica recognizes that the conversion process will trigger a change in ownership resulting in a change in control under the governing regulations.  CollegeAmerica will of course comply with the change in ownership application requirements and is preparing to file pre-acquisition review applications for each of the four separate institutions to facilitate that application and approval process.

Complaint, Doc 1-9, at 2; *see* A9 ("Under the HEA, when an institution of higher education undergoes a change in ownership or control, the institution's program participation agreement expires and the institution's eligibility to particpate in HEA programs ceases.  34 C.F.R. § 600.31.") (CEHE's complaint filed in district court) (party admission).

In the same letter sent prior to the acquisition, CollegeAmerica admitted that the financial requirements for new program participation agreements likely would not be met for a few years following the acquisition:

> The debt that CEHE will incur to finance the acquisition of CollegeAmerica via merger will impact its composite score in the *first few years*.  Based on the most recent audited financial statements, each of the four listed CollegeAmerica entities had composite scores well in excess of the 1.5 standard.  It is anticipated that, *for at least the initial years* after the merger is consummated, the *composite score for CEHE may be well below 1.0 due to the debt* that will finance the merger.  Similarly, the audited same day balance sheet to be submitted in connection with the change in ownership and the balance sheets *for the initial years*

> after the sale *may not meet the acid test ratio used to compute
> financial responsibility* under 34 C.F.R. 668.15(b)(8).

Complaint, Doc 1-9 at 3 (italics added).

CEHE also knew that it would not meet financial responsibility standards upon

completion of the acquisition, and CEHE expected Education to require CEHE to provide

financial guarantees in order for the four schools to be certified for program participation:

> Additionally, CEHE recognized that the debt it would incur to
> finance the transaction would cause its composite score to fall
> below the Department's minimum standard.  When an institution's
> composite score falls below standards, the institution may be
> required to provide financial security as a condition of continued
> Title IV eligibility.

Complaint, ¶ 44 (party admission).

On November 2, 2012, Education responded to CollegeAmerica's letter with 23 requests

for information.  A186-188 (letter attached to CEHE's district court complaint).  Several of the

requests related to financial matters.  *Id.*

IV.  <u>Administrative Review Of CEHE's Application Continued Until December 2018</u>

`        Education has never determined that CEHE met all financial responsibility requirements

for participation in the various Federal grant and Federally-insured loan programs.

In January 2015, Education demanded financial guarantees from CEHE, and denied

CEHE advance payments, as conditions for eligibility to participate in the spending programs:

> These [financial] statements yield a composite score of 0.2 out of a
> possible 3.0.  A minimum score of 1.5 is necessary to meet the
> requirement of the financial standards.  Accordingly, the Center
> fails to meet the standards of financial responsibility as described
> in 34 C.F.R. § 668.172, Financial Ratios.

> Additional factors were considered in arriving at the amount of the
> letter of credit:

The 2012 balance sheet includes a very high amount of debt.  Long term debt, current prortion and future portion, amount to $423,000,000, or 79% of total assets.

The 2013 balance sheet contains a high amount of Goodwill. Goodwill amounts to $419,042,664 or 78% of total assets.

The schools are undergoing a change in ownership where the new owning entity has no prior experience in administering Title IV programs.

The acid test ratio for the Center's balance sheet of 0.53:1 also fails the test of financial responsibility.

In view of its failure to meet the financial responsibility standards, and in view of the additional risk factors nowed above, the colleges may continue to participate in the Title IV, HEA programs under the following:

**Provisional Certification (34 C.F.R. § 668.175(f))**

*The Center must post a letter of credit in the amount of $71,657,360 and the above named colleges must be provisionally certified for a period of up to three complete award years.  This amount represents 50% of the Title IV, HEA program funds received by the institutions during their most recently completed fiscal year.*

Complaint, Doc 1-5, at 1-2 (letter, dated January 26, 2015) (brackets and italics added; bold in original); *id.* at 2 ("The institutions will be placed on the cash monitoring 1 payment method.").

In the spring of 2015, CEHE protested the amount of the letter of credit required to establish the financial responsibility component of program eligibility.  A17-20 (CEHE complaint filed in district court).  However, in the exchange of correspondence, CEHE admitted that it did not meet the financial responsibility requirement for program eligibility without providing some financial guarantees to Education:

CEHE further informed the Department that the only reason CEHE failed to meet the composite score minimum was because of the debt and goodwill on CEHE's balance sheet.

A18 (district court complaint) (party admission).

In May 2015, Education agreed to reduce the letter of credit requirement to $42.9 million.

A18-19 (party admission).  Eventually, Education agreed to permit CEHE to make escrow

deposits – in lieu of the required letter of credit – as the means to meet financial responsibility

requirements for eligibility:

> Ultimately, the Department agreed to an alternative to its LOC
> demand.  The Department said CEHE could make three escrow
> deposits of $14.3 million dollars each, totaling $42.9 million
> dollars, by December 31, 2015, in lieu of a letter of credit.

A20 (CEHE complaint filed in district court) (party admission).

In August 2015, Education notified CEHE that it had failed to demonstrate the

administrative capability element for program eligibility:

> Failure to comply with all applicable regulatory requirements,
> including the requirement to report GE program information to
> NSLDS, is an indication that your institution lacks the
> administrative capability to participate in the Title IV student
> financial assistance programs.

A190 (email filed by CEHE in district court).

In March 2016, Education asked CEHE about the current accreditation status of several

campus locations, and offered to re-open the electronic application so that CEHE could provide

updated information.  A194-195 (letter filed by CEHE in district court).   In the same letter,

Education reminded CEHE that the four institutions operating under temporary provisional

program participation agreements "remained for-profit institutions for Title IV program

purposes" while Education reviewed CEHE's application for new agreements.  A195.

On August 11, 2016, Education issued a formal decision rejecting CEHE's application to

re-classify the four schools as non-profit institutions.  Education determined that prior to the

acquisition, profits flowed to the Carl Barney Living Trust, and after the acquisition large debt

payments flowed to the Carl Barney Living Trust:

> The Transaction that resulted in the change of the Colleges'
> ownership was structured in such a way that an income stream of
> over $400 million was intended to continue to flow to the Carl
> Barney Living Trust ("the Trust"), the former owner of the
> Colleges, just as an income stream flowed to the Trust while the
> Colleges operated in a for-profit status.

A202 (redacted exhibit attached to the CEHE complaint filed in district court).  Education

offered CEHE four provisional program participation agreements as for-profit institutions, and

Education announced that the four existing temporary provisional program participation

agreements would expire on August 31, 2016.  A200.

On August 31, 2016, CEHE filed a complaint challenging Education's administrative

decision in the United States District Court for the District of Utah.  *See* A1-44 (district court

complaint, without exhibits).  CEHE alleged that Education's administrative decision concerning

Education's application for four program participation agreements violated the APA:

> Plaintiff is, therefore, entitled to an order and judgment from this
> Court declaring that the Department's August 11, 2016 letter
> Decision is not in accordance with law and is arbitrary and
> capricious within the meaning of 5 U.S.C. § 706, and ordering the
> Department to hold that the Colleges are nonprofit educational
> institutions for all purposes.

A38.  The litigation continued for more than two years:

> The parties were eventually able to settle their dispute with regard
> to CEHE's nonprofit status, and on November 29, 2018 the
> Department issued a new decision in which it officially recognized
> the Colleges' nonprofit status.  However, the Department declined
> to withdraw its November 22, 2016 citation for CEHE's
> purportedly late FYE 2015 audit submission.

Complaint, ¶ 53.

When Education issued four provisional program participation agreements on December 19, 2018, those provisional program participation agreements required financial guarantees, and no advance payments, to satisfy financial responsibility eligibility requirements in Education's regulations:

> **Funding Arrangement Other Than Advance, and Surety for Not Less Than 10% of Title IV, HEA Funds**
>
> *The institution does not meet the standards of financial responsibility as set forth in 34 CFR § 668.171.* Pursuant to 34 CFR § 668.175(f) and as a condition of entering into the Program Participation Agreement (PPA) under Provisional Certification, the institution agrees (a) to participate in the Title IV, HEA programs *without recourse to the Department's standard advance funding arrangement*, and (b) to maintain *an escrow account with the Department for $16,234,899* for the school group.  The escrow account is based on a minimum amount of at least 10% of the Title IV, HEA program funds received by the institution during the last fiscal year for which figures are available or for the projected fiscal year during which the escrow account will be in place.

A119, A136, A153, A170 (italics added; bold in original).

V.    <u>Administrative Determinations Concerning Eligibility Continued After 2018</u>

On or about May 7, 2020, Education sent unexecuted provisional program participation agreements to CEHE for three institutions.  These unexecuted certifications contained requirements for financial guarantees (in the minimum amount of at least 10% of Title IV, HEA program funds received by the four institutions during the last complete fiscal year) and permitted no advance payments to CEHE.   A212, A230, A248; *see e.g.,* A227 (signed by CEHE on May 7, 2020).  On May 11, 2020, CEHE stated it would comply with the financial conditions, but CEHE sought to amend the provisional program participation agreements to further state that the financial guarantees would "expire effective January 1, 2021."  Complaint, Doc 1-11, at 1-2.

By letter, dated May 20, 2020, Education rejected CEHE's proposed modifications to the provisional program participation agreements.  Complaint, Doc 1-13, at 1.  Education interpreted the regulations to mean that "the provisional certification alternative will not expire until CEHE's FY2020 financial statements are submitted in 2021, at the earliest."  *Id.*   In a separate letter sent the same day, Education increased the amount of funds required for the escrow account to $20,877,279 because $20,877,279 was the amount equal to "10% of the Title IV, HEA program funds received by CEHE during its most recently completed fiscal year." Complaint, Doc 1-12, at 2.

On May 26, 2020, CEHE disputed Education's interpretation of the regulations, but agreed to Education's administrative determination that CEHE must place more funds into the escrow account:

> Although we disagree with your analysis, at the present time, my client is not looking to litigate this issue with the Department (though it does reserve the right).  My client is willing to maintain the escrow account at 10% of total Title IV funds consistent with the terms of your May 20, 2020 response.

Complaint, Doc 1-14, at 2.  In a letter, dated May 29, 2020, Education stated that escrow funds would be released after "the Department has screened and accepted" CEHE's FY2020 financial statements, if certain other conditions were met:

> Your letter requested confirmation that the Department will release the escrow funds no later than two weeks after CEHE submits acceptable FY2020 financial statements to the Department.  The Department agrees that, as long as no other violation of financial or past-performance standards exist, and no assessed liabilities resulting from a program review, audit resolution, or loan discharges have been appealed, finalized, and remain unpaid at that time (or not appealed and remain unpaid), the Department will release the escrow funds within two weeks of the date the Department has screened and accepted CEHE's FY2020 financial statements.

- 17 -

Complaint, Doc 1-15, at 1-2.

On May 29, 2020, Education issued three provisional program participation agreements. A227 (date of certification for CollegeAmerica, Denver); A245 (date of certification for California College San Diego); A263 (date of certification for CollegeAmerica, Flagstaff).  None of the three provisional program participation agreements contained any reference to releasing CEHE from its financial guarantee.  *See* A210-263.

Roughly two weeks later, on June 16, 2020, one of the three colleges, CollegeAmerica Denver, notified its students that the institution was closing, and CollegeAmerica Denver would cease instruction on September 13, 2020.  A264.

Approximately eight months later, in February 2021, CEHE lost its probationary accreditation for one or more of its remaining schools.  Complaint, ¶ 141 ("at its February 2021 meeting, ACCSC prematurely withdrew CEHE's accreditation."); *see id.* ¶ 135 ("In September 2018, ACCSC concluded that several of the Colleges were out of compliance with multiple ACCSC Standards, including those involving student graduation and employment rates, and placed CEHE on probationary status.").

Immediately after losing its accreditation, CEHE sent its Fiscal Year 2020 audit submission to Education on March 5, 2021.  Complaint, ¶ 59.  Within a few weeks, CEHE started the process of closing all remaining schools:

> CEHE had no alternative but to start the process of closing the Colleges, and begin exploring other ways of tackling the problems facing higher education.  It stopped enrolling students on April 22, 2021.

*Id.* ¶ 148 (party admission); *see id.* ¶ 20 ("To be eligible to participate in Title IV programs, institutions must maintain accreditation from a Department-recognized accreditor.").

Six days later, on April 28, 2021, Education sent at least two letters (to Stevens Henager College and to California College San Diego) changing the payment method available to CEHE's schools.  *Id.* Doc 1-19; *id.* Doc 1-20.  Education explained that this administrative action was necessary because the loss of accreditation had increased financial risks:

> The Department has taken this action because the institution's accreditor, the Accrediting Commission of Career Schools and Colleges ("ACCSC") withdrew the accreditation of Stevens Henager College/Independence University ("SHC"), subject to appeal, in a letter dated April 22, 2021.  SHC and CCSD are both owned by the Center for Excellence in Higher Education ("CEHE").  Because SHC's loss of accreditation poses a financial risk to CEHE, it similarly poses a risk to CCSD.

*Id.* Doc 1-20; *see id.* ¶ 151 ("They explained that the action was taken because ACCSC had withdrawn SHC's and CCSD's accreditation.").

CEHE encountered difficulties when submitting its first payment claims using the HCM2 method.  *Id.* ¶ 165-166.  On July 22, 2021, CEHE demanded immediate payment of its HCM2 payment request, and the release of all funds held in the escrow account, or CEHE would file suit challenging Education's failure to take these administrative actions.  *Id.,* Doc 1-22, at 3 ("If this situation cannot be resolved by Monday July 26th, CEHE's only remaining option is to commence litigation and seek a Temporary Restraining Order compelling the Department to pay the reimbursement.").

On July 27, 2021, CEHE asked Education to identify information needed to support CEHE's HCM2 payment request:

> I am trying to work through and promptly respond to the information requested in Mr. Garza's July 26 letter.  Frankly, I need your immediate input and explanation in order to complete the response.

*Id.* Doc 1-23, at 2.  Education responded the next day.  *Id.* Doc 1-23 at 1.

- 19 -

On August 4, 2021, Education responded to a letter from CEHE "dated July 29, 2021,

requesting additional information regarding the closure of Independence University (IU) and

California College San Diego (CCSD)." *Id.* Doc 1-24, at 1.  Among the many topics addressed,

Education reminded CEHE of the regulatory requirement to return certain financial aid funds:

> IU and CCSD must return to the Federal government any
> unexpended funds that the institution has received under the Title
> IV, EHA programs minus any administrative allowance the
> institution is entitled to receive.  34 C.F.R. § 668.26(c)(1).  This
> includes any credit balances that the institution was *unable to
> deliver to students*.

*Id.* Doc 1-24, at 3 (italics added).  Education also explained the current regulatory process for

considering CEHE's HCM2 payment request:

> *As a result of IU's and CCSD's loss of eligibility dated August 1,
> 2021, the Department has transferred IU and CCSD to Stop
> Payment, which prevents the institution from obtaining any
> additional Title IV funds at this time*.  IU and CCSD are permitted
> to submit a final Heightened Cash Monitoring 2 (HCM2) request
> for funds earned by eligible students that the institution has not
> previously received.  *IU and CCSD each should submit the final
> request using the same procedures provided to the institution when
> it was placed on HCM2*.  These final HCM2 requests must be
> submitted no later than 90 days from the date of this letter.  No
> additional requests for funds will be accepted.  *It should be noted
> that HCM2 funds will not be released until all potential liabilities
> are calculated, and may be used to offset those liabilities*.

*Id.* Doc 1-24, at 3 (italics added).  CEHE does not allege in its complaint that CEHE ever made

any final HCM2 payment request pursuant to these instructions.  *See id.* ¶¶ 1-259.

Education also explained the regulatory process for returning all, or part, of CEHE's

financial guarantee in the escrow account:

> The Department is holding funds in Escrow number 1707 in the
> amount of $20,877,279.  *The Escrow will be held until all
> anticipated liabilities, including closed school discharges,
> borrower defense discharges, and unsubstantiated cash balances,
> have been finalized*.  This process could take up to 3 years.  If the

> Department determines that any liabilities are owed, the Escrow
> will be collected and the liabilities offset from the proceeds.

*Id.* Doc 1-24, at 5 (italics added).

ARGUMENT

I.    <u>Standard Of Review</u>

Like its predecessor court, the Court of Federal Claims is a court of limited jurisdiction. *Dynalectron Corp. v. United States,* 4 Cl. Ct. 424, 428 (1984). Absent congressional authorization for this Court to consider a claim against the United States, the Court does not possess authority to consider the claim or to grant relief. *United States v. Testan,* 424 U.S. 392, 399 (1976); *United States v. Sherwood,* 312 U.S. 584, 586 (1941). Congressional consent to suit in this Court, thereby waiving the sovereign immunity of the United States, must be explicit, and any such statute is strictly construed. *United States v. Mitchell,* 445 U.S. 535, 538 (1980) (*Mitchell I*); *Fidelity Construction Co. v. United States,* 700 F.2d 1379, 1383 (Fed. Cir. 1983). A waiver of sovereign immunity cannot be implied, but must be unequivocally expressed. *United States v. Testan,* 424 U.S. at 399; *United States v. King,* 395 U.S. 1, 4 (1969).

When considering a motion to dismiss pursuant to RCFC 12(b)(1), the Court should presume all *undisputed* factual allegations to be true, and should draw all reasonable inferences from the undisputed facts in favor of the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236-37 (1974); *accord Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988) ("Because Reynolds' amended complaint alleged that she served pursuant to a contract, this allegation, left unchallenged, would be sufficient to support Tucker Act jurisdiction."). The Court should not place weight upon any assertions in the complaint other than undisputed allegations of fact, because "legal conclusions, deduction, or opinions couched as factual

- 21 -

allegations are not given a presumption of truthfulness." *Rochman v. United States*, 27 Fed. Cl. 162, 168 (1992) (citation omitted).

If facts pertinent to this Court's jurisdiction are challenged, a plaintiff cannot rely merely upon allegations in the complaint; instead, the plaintiff must bring forth relevant, competent proof to establish jurisdiction:

> If his allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof.  And where they are not so challenged, the court may still insist that the jurisdictional facts be established or the case be dismissed, and for that purpose the court may demand that the party alleging jurisdiction justify his allegations by a preponderance of evidence.

*McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936); *accord Reynolds*, 846 F.2d at 748 (preponderance of the evidence standard should be applied to the issue of whether elements of a contract existed); *but see Columbus Regional Hospital v. United States,* 990 F.3d 1330, 1341 (Fed. Cir. 2021) (non-frivolous allegation of a contract is sufficient to establish jurisdiction) (without discussing either *McNutt* or *Reynolds*).  When evaluating whether a claim falls within the jurisdiction of the trial court, the Court is not bound by the label that the plaintiff attaches to its claim.  *See Reynolds*, 846 F.2d at 747.

When considering a motion pursuant to RCFC 12(b)(6), the Court must determine not only whether the claim alleged is theoretically possible, but also whether the claim alleged is plausible.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 562-63 (2007); *McCutchen v. United States,* 14 F.4th 1355, 1362-1363 (Fed. Cir. 2021).  When evaluating whether a claim is plausible, the Court considers the complaint, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v Maker Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007); *accord McCutchen,* 14 F.4th at 1362-1363, 1368-1370

(relying upon 10 regulatory letters referenced in the complaint and an agency handbook to conclude that plaintiff failed to state a claim); *Rocky Mt. Helium, LLC v. United States*, 841 F.3d 1320, 1325 (Fed. Cir. 2016) (relying upon a document referenced in the complaint to dismiss a contract claim pursuant to RCFC 12(b)(6), where the document contradicted a factual allegation in the complaint) ("when a disparity exists between the written instrument annexed to the pleadings, and the allegations in the pleadings, the terms of the written instrument will control").

When considering a motion for summary judgment pursuant to RCFC 56 challenging plaintiff's ability to support the elements of its claim, it is not our burden to produce any evidence to disprove any element of plaintiff's claim.  All we need to do in order to establish entitlement to summary judgment is to challenge plaintiff's claim.  It is plaintiff's burden to come forth with probative proof sufficient to create a genuine issue of material fact regarding all necessary elements of any challenged claim in order to avoid summary judgment with regard to that claim.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 319-325 (1986) (summary judgment appropriate where widow could not prove her husband was exposed to an asbestos product of the defendant; defendant had no obligation to present any evidence that the deadly product was not its own).  For CEHE to defeat our summary judgment motion with regard to any claim, CEHE must offer more than just some sort of evidence in support of its claim.  CEHE must offer sufficient probative evidence that it could convince a reasonable jury regarding the relevant issue.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (a "genuine" issue of material fact is raised "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"); *Minkin v. Gibbons,* 680 F.3d 1341, 1348-1352 (Fed. Cir. 2012) (report and other evidence were not sufficient to create a genuine issue of material fact) (summary judgment was proper even though the nonmoving party offered some evidence).

- 23 -

II.     CEHE's APA Claims Must Be Dismissed For Lack Of Jurisdiction

The gravamen of CEHE's complaint is that Education made improper administrative decisions while regulating the eligibility of four schools to participate in financial aid spending programs.  CEHE alleges that Education required excessive financial guarantees, slowed payments, and failed to timely pay CEHE money placed in escrow by CEHE to meet regulatory requirements.  *E.g.,* Complaint, ¶ 13 (summarizing challenged regulatory actions).  CEHE also alleges that Education has improperly influenced an accreditation agency.  *E.g., Id.,* ¶ 13 (pressured accreditor).  All of these allegations relate to the regulatory scheme put in place by Congress to restrict the scope of Federal spending for higher education.

For at least six decades, Congress has limited certain spending to certain "institutions of higher education."  In general, Congress has limited certain spending to schools meeting requirements imposed by three separate entities:  (1) the State where the school is located, (2) the accreditation agency, and (3) Education.  *See e.g.,* National Defense Education Act of 1958, § 103 (defining institution of higher education in terms of State authorization, and accreditation of a school's program by a nationally recognized accrediting agency); *id.* §§ 201-206 (contributions to school loan funds limited to institutions of higher education making certain agreements with Education); § 1001 (authority of Education to manage the spending program).  The definition of an institution of higher education has been amended in various ways over the years, and currently there are different definitions for different spending purposes, *compare* 20 U.S.C. § 1001 *with* 20 U.S.C. § 1002, but the basic concept of regulation by three separate entities has remained a feature of the statutory scheme:

> Thus, the statutory definition of an institution of higher education provides the framework for a shared responsibility among accrediting agencies, States, and the Federal government to ensure that the "gate" to Title IV, HEA programs is opened to only those

- 24 -

> institutions that provide students with quality education or training
> worth the time, energy, and money they invest in it.  The three
> "gatekeepers" sharing this responsibility have traditionally been
> referred to as "the triad."  While the concept of a triad of entities
> responsible for gatekeeping has had a long history, the triad has not
> always worked as effectively as it should to ensure educational
> quality, nor has it served as an effective deterrent to abuse by
> institutions participating in the Title IV, HEA programs.

Student Assistance General Provisions and Federal Pell Grant Program, 59 Fed. Reg. 9526

(February 29, 1994).

In 1992, Congress made statutory changes to provide for more vigorous monitoring of

eligibility to participate in the spending programs.  For example, Congress provided for periodic

reviews by State regulators, and Congress provided funding for these State efforts.  Higher

Education Amendments of 1992, § 494(a).  Congress placed time limits on eligibility

certifications, and thus required new applications and new reviews by Education (including

reviews of financial capability) periodically.  *Id.*, § 498(g) (program participation agreement

sunset provision); *id.*, § 498(a) (application process).  Congress gave Education authority to

condition eligibility upon financial guarantees in certain circumstances.  *Id.*, § 498(c) (financial

review and authority of Education to require financial guarantees); *id.*, § 498(e) (authority to

condition eligibility upon receipt of financial guarantees from the owner of an institution); *id.*,

§ 498(i) (change in ownership control automatically terminates an institution's program

participation agreement); *Id.*, § 498(h) (provisional program participation agreements).

In the complaint, CEHE challenges a variety of administrative actions taken by Education

while carrying out regulatory powers established by Congress, and CEHE also challenges some

actions taken by the accreditation agency.  *E.g.,* Complaint, ¶¶ 25-74 (styled section I; alleging

imposition of "oppressive financial security" in connection with Education's eligibility

determinations); *id.,* ¶¶ 75-79 (styled section IIa; alleging that regulatory decisions concerning

payment methods harmed CEHE); *id.,* ¶¶ 80-85 (styled section IIb; challenging Education's reliance upon CEHE's loss of accreditation as the regulatory justification for changing the payment method); *id.,* ¶¶ 86-102 (styled section IIc; challenging actions of accreditation agency); *id.,* ¶¶ 103-124 (styled section IId; challenging lawsuit allegedly derived from actions of accreditation agency); *id.,* ¶¶ 125-147 (styled section IIe; challenging actions of accreditation agency); *id.,* ¶¶ 148-197 (styled section IIf; challenging regulatory actions taken by Education after CEHE lost accreditation).[2]

A more detailed analysis would show Education's legal authority to take the challenged regulatory actions is supported by specific regulations, but this review is unnecessary here because the larger point is that this Court lacks jurisdiction to consider these challenges to Education's regulatory actions. *Martinez v. United States,* 333 F.3d 1295, 1313 (Fed. Cir. 2003) (*en banc*) ("[T]he Court of Federal Claims lacks APA jurisdiction."); *accord Portland Mint v. United States,* 160 Fed. Cl. 642, 664-665 (2022) (no jurisdiction to consider APA claims; citing cases).

In 2016, when CEHE filed suit in district court, CEHE tacitly conceded that district court was the proper forum for any claims against Education regarding the eligibility of its four schools to participate in financial aid spending programs.  Indeed, in 2016, CEHE expressly stated that it was challenging Education's administrative actions pursuant to the APA.  A38.

In the complaint recently filed in this Court, CEHE has made similar claims challenging Education's administrative decisions (including challenges to some of the same administrative decisions that were challenged in district court), but CEHE seeks to re-label its claims as contract

---

[2]  Any challenge to the decisions of the accrediting agency must be brought in district court.  20 U.S.C. § 1099b(f) (suit by institution against accreditation agency "shall be brought in the appropriate United States district court").

claims.  *E.g.,* Complaint, ¶ 13 (summarizing challenged regulatory actions); ¶ 14 (labeling those actions contract actions).  This Court is not bound by the labels that CEHE puts on its claims; instead, this Court must look to the substance of plaintiff's claims.  *Reynolds*, 846 F.2d 747. CEHE's claims are APA claims, and these claims should be dismissed for lack of jurisdiction.

III.    CEHE's Tort Claims Must Be Dismissed For Lack Of Jurisdiction

The complaint includes many allegations that Education engaged in intentional interference with CEHE's business, and that Education made intentional misrepresentations for the purpose of harming CEHE.  *E.g.,* Complaint, ¶13 ("the Department promised to process CEHE's HCM2 submissions consistent with regulatory requirements, but it never intended to pay.").  These claims sound in tort, and must be dismissed for lack of jurisdiction.  28 U.S.C. § 1491(a)(1) ("not sounding in tort"); *Bench Creek Ranch, LLC v. United States,* 149 Fed. Cl. 222, 226 (2020) (dismissing challenge to agency's administration of public lands for lack of jurisdiction where the allegations sounded in tort).

IV.    CEHE's Purported Contract Claims Should Be Dismissed

Although CEHE has labeled its administrative claims as contract claims, *compare* Complaint, ¶ 13 *with id.,* ¶ 14, CEHE has failed to allege any contract.  As a matter of law, the regulatory certification of program eligibility, called a program participation agreement, is not a contract.  20 U.S.C. §§ 1994, 1099c; *see e.g., American Bankers Association v. United States,* 932 F.3d 1375, 1382 (Fed. Cir. 2019) (actions taken to satisfy a regulatory scheme are not contracts; conditions for eligibility established by Congress are not offers to enter into a contract); *but see Columbus,* 990 F.3d at 1341 (non-frivolous allegation of a contract is sufficient to establish jurisdiction).  Similarly, CEHE's decision to place funds into an escrow account to meet a regulatory requirement for eligibility is not a contract.  Because no program participation

agreement or memorandum documenting a financial guarantee can be a contract, as a matter of statutory interpretation, then any claim premised upon such a contract is mistaken, as a matter of law, and should be dismissed for lack of jurisdiction.

We know of one previous case in this Court concerning a program participation agreement. In that case, the United States mistakenly considered a program participation agreement to be a contract. *San Juan City College, Inc. v. United States,* 58 Fed. Cl. 26, 27 (2003) ("Defendant concedes, however, that the agreement functions as a legally-binding contract."). The Federal Circuit accepted the assumption of both parties that the agreement was a contract; the issue of whether a program participation agreement is a contract was never in dispute, and the appellate decision contains no holding on this issue. *See San Juan City College, Inc. v. United States,* 391 F.3d 1357 (Fed. Cir. 2004). *Dicta* is not binding precedent. *E.g., Central Virginia Community College v. Katz,* 546 U.S. 356, 363 (2006); *but see Columbus,* 990 F.3d at 1339 n. 2 (dicta that a disaster agreement was a contract given some weight where "both parties devote[d] considerable argument as to whether their Disaster Assistance Agreement is . . . a binding contract" [citation omitted]).

Assuming for the sake of argument that an allegation of a contract is sufficient to establish jurisdiction, we respectfully request that the Court dismiss the contract claims for failure to state a claim because the relevant statutes are neither offers to contract nor authority for Education to contract. *See e.g., American Bankers,* 932 F.3d at 1382-1384 (dismissing contract claims for failure to state a claim).

Alternatively, if the Court declines to dismiss the contract claims for lack of jurisdiction or for failure to state a claim, the Court should enter summary judgment in favor of the United

States pursuant to RCFC 56 because CEHE cannot demonstrate a genuine issue of material fact

concerning every necessary element of a Federal contract claim.

A.    CEHE's Contract Claims Should Be Dismissed
For Lack of Jurisdiction Because CEHE Has Failed To Identify Any Contract

1.    Program Participation Agreements Are Not Contracts

Program Participation Agreements are not contracts.  Instead, these documents are

merely part of a regulatory scheme to limit higher education spending.

Congress has the power to spend "for the common Defence and general Welfare of the

United States."  U.S. Constitution, Article 1, Section 8, Clause 1.  It is common for Congress to

change decisions, or make new decisions, about spending for education.  Accordingly, in

Chapter 28, Congress has purposefully limited spending authorizations for higher education

spending to short periods of time.[3]  Thus, spending must be re-authorized (if at all, and usually

with changes) by a subsequent Congress.

By the plain meaning of one of the relevant statutes, program participation agreements

are merely eligibility certifications containing statements of current conditions to that eligibility.

> The agreement shall condition the initial and continuing eligibility
> of an institution to participate in a program upon compliance with
> the following requirements . . .

20 U.S.C. § 1094(a).  Section 1094(c), and related provisions such as sections 1099c and 1002,

prescribe a continuing regulatory review of an institution's eligibility.   No static right to

eligibility to participate in any spending program for any period in the future is ever created.

---

[3] *See e.g.,* National Defense Education Act of 1958, § 201 (appropriations authorized
only through fiscal year 1966); § 206 (capital distribution to United States "not later than
September 30, 1966); Higher Education Act of 1965, Pub. L. 89-329, 79 Stat. 1219,
§ 401(b) (appropriations for "Title IV"" authorized only from fiscal year 1966 through fiscal
year 1971); *id.* § 407(b) (extending capital contributions for loan funds established by the 1958
Act for three fiscal years).

Even after Education issues a program participation agreement, Congress requires Education to continue to monitor financial and administrative capabilities, and to take actions to limit, suspend or terminate eligibility when an institution fails to meet regulatory standards. 20 U.S.C. § 1094(c); 20 U.S.C. § 1099c; 20 U.S.C. § 1002; *see also* 20 U.S.C. § 1099c-1 (program reviews). Education is specifically authorized to require financial guarantees from an institution or its owner when certain circumstances occur. 20 U.S.C. § 1099c(c)(e).

Program participation agreements do not begin with contract negotiations, or any competition for contracts. Any program participation agreement starts with an application. *See* 20 U.S.C. § 1099c(b). In general, Education reviews the application to determine whether the school meets State and accreditation requirements (*i.e.,* constitutes an institution of higher education) and whether the school meets financial and administrative standards. 20 U.S.C. § 1099c(a); *see* 20 U.S.C. § 1001 (general definition of institution of higher education including authorization by a State and accreditation); 20 U.S.C. § 1002 (separate definition of institution of higher education for purposes of subchapter IV); 20 U.S.C. § 1099a (obligations of State in connection with institution of higher education eligibility determinations and eligibility monitoring); 20 U.S.C. § 1099b(a-d) (criteria for determining what accrediting agencies may satisfy statutory accreditation requirements); 20 U.S.C. § 1099b(j) (impact of loss of accreditation).

In summary, the statutory scheme plainly requires Education to monitor and restrict eligibility to participate in the spending programs on a continuing basis. These statutes do not demonstrate any Congressional intent to form a contract. *E.g., American Bankers,* 932 F.3d at 1382 (actions taken to satisfy a regulatory scheme are not contracts; conditions for eligibility established by Congress are not offers to enter into a contract).

Indeed, the eligibility certification provisions stand in stark contrast to other provisions in higher education spending reauthorizations where Congress plainly *did* intend for Education to enter into contracts for goods and services.  For example, the provision immediately preceding the provision first establishing the name "program participation agreement" (section 487 of the 1980 Act) authorizes Education to award *contracts for training*.  This provision states, in part:

> The Secretary is authorized to enter into contracts with appropriate public agencies or nonprofit private organizations or institutions of higher education to provide training for financial aid administrators, student peer counselors, student staff or volunteers who provide financial aid, admissions and academic counseling and outreach, and student support programs in postsecondary education in postsecondary institutions, communities or statewide programs.

1980 Act, § 486.  Congress knew how to authorize Education to enter into contracts when Congress intended to do so.

Further, Congress created a separate organization within Education to award contracts. In 1998, Congress created a separate "performance-based organization" (PBO) within Education to administer various matters, including contracts for goods and services.  1998 Act, § 141(a)(1) ("discrete management unit responsible for managing the operational functions supporting the programs authorized under title IV of this Act, as specified in subsection (b)"); *id.* § 141(b)(2)(iv) ("all aspects of contracting for the information and financial systems supporting student financial assistance programs under this title").  As amended, the relevant statutory authorities concerning the PBO (including contracting authorities) are now set forth in 20 U.S.C. § 1018 and 20 U.S.C. § 1018a.

As a matter of law, no temporary provisional program participation agreements, provisional program participation agreements, or program participation agreement is a contract.

2.      The 2015 Escrow Agreement Is Not A Contract

In 2015, CEHE signed a document memorializing a financial guarantee required by statute and regulation.  Complaint, Doc 1-4.  This document is authorized by statute to be a condition of participation in the spending program.  20 U.S.C. § 1094(c); 20 U.S.C. § 1099c.  A document executed to satisfy a regulatory condition for program eligibility is not a contract.  *See American Bankers,* 932 F.3d at 1382.

We have challenged a jurisdictional predicate, the existence of a contract, and because CEHE cannot demonstrate the existence of the jurisdictional predicate (as a matter of law), the claim should be dismissed for lack of jurisdiction.  *McNutt,* 298 U.S. at 189; *accord Reynolds,* 846 F.2d at 748; *but see Columbus,* 990 F.3d at 1341.

B.      CEHE Has Not Plausibly Alleged A Federal Contract

Assuming for the sake of argument that the Court possesses jurisdiction to consider CEHE's contract claims, we respectfully request that the Court dismiss those claims pursuant to RCFC 12(b)(6) for failure to plausibly allege any contract, or any breach of any contract.

There are four requirements to form a contract binding on the United States:

(1)  mutuality of intent to contract,

(2)  lack of ambiguity in offer and acceptance,

(3)  consideration, and

(4)  a government representative having actual authority to bind the United States in contract.

*American Bankers,* 932 F.3d at 1380-1381.  For all the reasons stated in the previous section of our brief, CEHE has failed to plausibly allege the first element:  mutuality of intent to contract.  *See American Bankers,* 932 F.3d at 1384 (no clear indication of the Government's intent to contract in the statute) (contract claim dismissed for failure to state a claim).  Furthermore,

CEHE has failed to plausibly allege any government representative having actual authority to bind the United States in contract. CEHE has not alleged any contract made by a contracting officer, or any other official in the PBO. CEHE has not plausibly alleged lack of ambituity in offer and acceptance, or consideration.

Indeed, far from lack of ambiguity in offer and acceptance, the complaint does not even coherently describe the regulatory documents at issue in this case. For example, CEHE vaguely alleges four program participation agreements "between the Colleges and the Department." Complaint, ¶ 17. CEHE alleges that these four program participation agreements were breached numerous times between 2012 and 2022. *See id,* ¶¶ 25-197. The allegation of four program participation agreements in force from 2013 through 2022 is not plausible when considered in the context of the statutory scheme. *See* 20 U.S.C. § 1099c (temporary provisional program participation agreements follow a change in ownership control and may be renewed month to month until review of the application for a new certification is completed). Moreover, a document attached to the complaint acknowledges that CEHE was required to submit an application following its acquisition of the four schools). Complaint, Doc 1-9, at 2-3; *see* Complaint, ¶ 44 (CEHE refers to the financial review following CEHE's application); Complaint, Doc 1-5, at 1-2 (in January 2015, Education demands a financial guarantee to meet an eligibility requirement). In summary, documents attached to the complaint demonstrate a regulatory process following an application – not any contract award following any unambiguous offer and acceptance.

If the Court takes judicial notice of the complaint filed by CEHE in district court in 2016 (a public document), then CEHE's vague allegation of four program participation agreements during the period between 2012 and 2022 is further rebutted. *See e.g., McCutchen,* 14 F.4th at

1368-1370 (taking judicial notice of the contents of 10 agency advisory letters published on website).  As demonstrated in our statement of facts, CEHE admitted in its district court complaint that CEHE's application was under review until August 2016.  Moreover, many documents attached to the complaint in this case refer to continuing regulatory actions, rather than to contract amendments or contract administration.  *E.g.,* Complaint, Doc 1-12 (letter from Education citing many regulations when increasing the required amount of the financial guarantee); Complaint, Doc 1-14 (letter from CEHE disputing Education's interpretation of certain regulations).

CEHE fails to plausibly allege that the escrow document executed in 2015 (to memorialize CEHE's financial guarantee) constitutes a contract for the same reasons.  The plain meaning of the escrow document confirms that CEHE was merely seeking to meet a regulatory condition for eligibility by placing funds in escrow in 2015.  *See* Complaint, Doc 1-4.  For the reasons stated in the previous section of our brief, CEHE has failed to plausibly allege mutuality of intent to contract.  *See* 20 U.S.C. § 1099c(c) (Education has authority to require financial guarantees as a condition of eligibility to participate in the spending program); *see also American Bankers,* 932 F.3d at 1384 (no clear indication of the Government's intent to contract in the statute).  CEHE has also failed to plausibly allege any government representative having actual authority to bind the United States in contract.  Indeed, the agreement is not even signed by any official of the United States – much less by any contracting officer, or any other official in the PBO.  *See* Complaint, ¶ 25; Complaint, Doc 1-4.  CEHE has also not plausibly alleged lack of ambiguity in offer and acceptance, or consideration.

Finally, CEHE alleges that "HCM2 letters are also valid and enforceable contracts, which expressly provided that, if CEHE disbursed funds to students on the Department's behalf, the

Department would reimburse CEHE for those funds upon proof of student eligibility for the advanced funds."  Complaint, ¶ 201.  On their face, these letters merely announce administrative decisions or discuss administrative decisions, and these letters are not signed by a contracting officer.  *See e.g.,* Complaint, Doc 1-24 (citing regulations).  CEHE has failed to plausible allege facts demonstrating mutuality of intent to contract, lack of ambiguity in offer and acceptance, a government representative having actual authority to bind the United States in contract, or consideration with regard to any of these letters.  *See American Bankers,* 932 F.3d at 1380-1381 (four necessary elements of a Federal contract).

      C.      CEHE Cannot Establish A Genuine Issue Of Material Fact
              With Regard To All Four Necessary Elements Of A Federal Contract

Alternatively, if the Court declines to dismiss the contract claims for lack of jurisdiction or for failure to state a claim, the Court should enter summary judgment in favor of the United States pursuant to RCFC 56 because CEHE cannot demonstrate a genuine issue of material fact concerning every necessary element of any Federal contract claim.

Our burden is merely to challenge CEHE to demonstrate a genuine issue of material fact with regard to each necessary element of any contract claim alleged.  *Celotex,* 477 U.S. at 319-325.  In this case, it is CEHE's burden to demonstrate both a contract and a breach.  *See American Bankers,* 932 F.3d at 1380-1381 (four elements of a Federal contract).  Because CEHE cannot demonstrate a genuine issue of material fact with regard to each necessary element of any alleged contract, the United States is entitled to summary judgment with regard to the contract claims.

V.      CEHE Has Failed To State A Taking Claim

The Fifth Amendment's Takings Clause provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. Amend. V  This Clause "is designed to

bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012) (quoting *Armstrong v. United States*, 364 U.S. 40 (1960)).

Courts have distinguished among several different types of takings. Initially, there is a distinction between physical takings, brought about by "the government's physical invasion or appropriation of private property," and regulatory takings, whereby "government regulations [] unduly burden private property interests." *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1213 (Fed. Cir. 2005). Regulatory takings are then further subdivided into categorical takings, which occur when "governmental action deprives a property owner of all economically beneficial uses of his property," and non-categorical takings, "where the property is not rendered totally valueless." *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1340 (Fed. Cir. 2018) (internal quotations omitted).

In this case, CEHE makes two similar taking claims, alleging that Education has not paid money owed. In count V, CEHE alleges that the Government has taken the money that CEHE put into escrow as a financial guarantee. Complaint, ¶¶ 239-247. In count VI, CEHE alleges that the Government took money owed to CEHE because CEHE has not yet been paid. *Id.* ¶¶ 248-253 (taking HCM2 funds never paid to CEHE). In both cases, CEHE alleges that Education might assert offsets upon the grounds that CEHE owes Education money. *Id.* ¶ 245; ¶ 252. Both are regulatory taking claims, but it is less clear whether CEHE alleges categorical takings. In both cases, CEHE seeks all the funds, with interest (a categorical taking), but, in both cases, the complaint might be construed to allege only a temporary taking pending Education's calculation of offsets, and imposition of such offsets, before Education pays CEHE none, some, or all of the money. *Id.* ¶¶ 245; 252.

A.      CEHE Has Not Plausibly Alleged That Education's
        Failure To Repay The Financial Guarantee Is A Taking

CEHE voluntarily placed funds into an escrow account (in varying amounts at various times)[4] in order to provide a financial guarantee to Education.  Imposition of a financial guarantee requirement is not a physical taking, and does not constitute a regulatory taking where the general purpose of the security requirement is to protect other private parties.  *Branch v. United States,* 69 F.3d 1571, 1576-1577, 1579-1580 (Fed. Cir. 1995).  Indeed, no *voluntary* transfer of property by a plaintiff (made for the plaintiff's own purpose, even if that purpose is to meet a regulatory requirement) constitutes a taking.  *E.g., American Bankers,* 932 F.3d at 1386 ("the requirement that member banks subscribe to reserve bank stock under the Federal Reserve Act does not constitute a regulatory taking"); *Portland Mint,* 160 Fed. Cl. at 673 (no taking where plaintiff voluntarily "sought to participate in the Redemption Program").

In any event, CEHE does *not* allege that Education's requirement that CEHE deposit a financial guarantee constituted a taking.  Instead, CEHE alleges that it is entitled to just compensation because Education *failed to return* CEHE's financial guarantee on March 5, 2021.  Complaint, ¶¶ 242-244; Complaint, ¶ 59 (CEHE timely submitted its FYE 2020 audit submission on March 5, 2021); *but see id.*, Doc 1-24, at 5 (letter from Education explaining why the financial guarantee was not immediately returned) ("The Escrow will be held until all anticipated

---

[4] *E.g.,* A20 (CEHE voluntarily placed **$42.9 million** in escrow "in lieu of a letter of credit"); A119, A136, A153, A170 (provisional program participation agreements issued in 2018 required **$16,234,899** in escrow; financial security calculated as ten percent of the Title IV, HEA program funds received in the previous year); A212, A230, A248 (provisional program participation agreements issued in 2020 required **$16,234,899** in escrow); Complaint, Doc 1-12, at 2 (financial guarantee requirement increased to **$20,877,279** on May 20, 2020 because $20,877,279 was the amount equal to "10% of the Title IV, HEA program funds received by CEHE during its most recently completed fiscal year").

liabilities, including closed school discharges, borrower defense discharges, and unsubstantiated cash balances, have been finalized.  This process could take up to 3 years.").

Even assuming for the sake of argument that it might be possible for CEHE to allege a regulatory taking based upon Education's failure to act,[5] CEHE has not plausibly alleged either of the two required elements of a regulatory taking:  (1) "cognizable Fifth Amendment property interest," and (2) that property was taken by the Government.  *Acceptance Insurance Companies, Inc. v. United States,* 583 F.3d 849, 854 (Fed. Cir. 2009).

The first required element is to allege a legally cognizant property interest in the context of the specific Government action alleged to be the taking.  *Id.,* at 854-858.  For example, in *Acceptance,* the Federal Circuit acknowledged that, as a general matter, the plaintiff in that case had a property right to sell or assign its interests in its own contracts, *id.* at 857, but the plaintiff had no cognizable property right to sell its contracts where the plaintiff had voluntarily submitted to a regulatory scheme that gave Agriculture the right to disapprove of the sale of certain contracts.  *Id.* ("by voluntarily entering into the federally regulated crop insurance business, Acceptance relinquished its right to freely transfer American Growers' insurance policies").  Similarly, in this case, as a general matter, CEHE has a property interest in the funds placed in an escrow account, but CEHE has no legally cognizable property right to the return of funds pledged as a financial guarantee before that financial guarantee can be applied to liabilities created in connection with regulated matters.  *See e.g.,* 34 C.F.R. § 668.175(h) (financial guarantee may be used to satisfy debts).  Thus, CEHE has failed to allege a cognizable property

---

[5] *E.g., Love Terminal,* 889 F.3d at 1341-1342 (a taking claim may not be based upon the Government's failure to take an action) (citing cases).

interest in the escrow account, and its claim fails.  *Acceptance,* 583 F.3d at 854 (no need to reach the second element of a taking claim if no cognizable property interest is plausibly alleged).

Assuming for the sake of argument that CEHE could prove a cognizable property interest in the financial security, the second required element of a taking claim is a specific allegation of some proper Government action that takes the property.  *E.g., Branch,* 69 F.3d at 1575-1576 (must "pinpoint what step in the sequence of events" constitutes the taking); *Acceptance,* 583 F.3d at 855 (pinpoint the agency action taking the cognizable property); *Rith Energy, Inc. v. United States,* 247 F.3d 1355, 1366 (Fed. Cir. 2001) (taking is premised upon proper agency action) ("required to litigate its takings claim on the assumption that the administrative action was both authorized and lawful"); *Lion Raisins, Inc. v. United States,* 416 F.3d 1356, 1369 (Fed. Cir. 2005) ("a claim premised on a regulatory violation does not state a claim for a taking"). CEHE has failed to allege any proper action by Education that constituted a taking of a legally cognizable property interest.

In this case, CEHE has not alleged any Government action was the taking – only a lack of Government action.  To the extent that the complaint might be construed as alleging that the escrow funds were taken by Education because Education is waiting to determine any offsets, then CEHE must either allege that Education's decision to wait is proper (and so no taking has occurred) or that Education's decision is improper (and therefore the waiting is not a predicate to a taking claim).

In the alternative, we seek summary judgment upon the grounds that CEHE cannot demonstrate a genuine issue of material fact with regard to each essential element of its claim.

B.    CEHE Has Not Plausibly Alleged That
Education's Failure To Pay HCM2 Funds Is A Taking

CEHE alleges that it encountered difficulties when submitting its first payment claims

using the HCM2 method.  Complaint  ¶ 165-166.  As demonstrated in more detail in our

statement of facts, a sequence of correspondence about such payment requests followed.  In a

letter dated August 4, 2021, Education provided CEHE with instructions concerning how to

apply for payment of HCM2 funds after the loss of program eligibility, and stated that Education

would not make payment until regulatory offsets had been calculated and applied:

> As a result of IU's and CCSD's loss of eligibility dated August 1,
> 2021, the Department has transferred IU and CCSD to Stop
> Payment, which prevents the institution from obtaining any
> additional Title IV funds at this time.  IU and CCSD are permitted
> to submit a final Heightened Cash Monitoring 2 (HCM2) request
> for funds earned by eligible students that the institution has not
> previously received.  IU and CCSD each should submit the final
> request using the same procedures provided to the institution when
> it was placed on HCM2.  These final HCM2 requests must be
> submitted no later than 90 days from the date of this letter.  No
> additional requests for funds will be accepted.  It should be noted
> that HCM2 funds will not be released until all potential liabilities
> are calculated, and may be used to offset those liabilities.

*Id.* Doc 1-24, at 3.  CEHE does not allege that it made any "final request" compliant with those

instructions.  Nonetheless, CEHE alleges that Education's failure to pay CEHE the full amount

of HCM2 funds (claimed by CEHE before August 4, 2021) is a taking.  *Id.*  ¶¶ 248-253.

CEHE has failed to allege a plausible taking claim with regard to the HCM2 funds for the

same reasons that its claim for a taking of the escrow account funds fails.  CEHE has not

identified any legally cognizant property interest because CEHE voluntarily submitted to a

regulatory scheme that requires certain forms of payment requests, and that permits certain

offsets.  *See e.g., Acceptance,* 583 F.3d at 854-858 (a general property interest is limited by the

applicable regulatory scheme).  Furthermore, CEHE has failed to pinpoint what specific proper

Government action took the property.  *See e.g., Branch,* 69 F.3d at 1575-1576 (pinpoint Government action); *Acceptance,* 583 F.3d at 855 (same); *Rith Energy, Inc. v. United States*, 247 F.3d at 1366 (proper Government action); *Lion Raisins*, 416 F.3d at 1369 (same).

In the alternative, we seek summary judgment upon the grounds that CEHE cannot demonstrate a genuine issue of material fact with regard to each essential element of its claim.

## VI.   CEHE Has Failed To State An Illegal Exaction Claim

A typical illegal exaction claim alleges that the Government has required the plaintiff to pay money to the Government, and the Government "in obtaining the money, has violated the Constitution, a statute, or a regulation."  *Boeing Company v. United States,* 968 F.3d 1371, 1383 (Fed. Cir. 2020); *see Aerolineas Argentinas v. United States,* 77 F.3d 1564, 1572 (Fed. Cir. 1996) ("recovery of monies that the government has required to be paid contrary to law") (airlines required to pay to keep alleged illegal immigrants in custody pending further legal actions were "in effect" required to pay the United States).

CEHE has failed to plausibly allege either element of an illegal exaction claim:  (1) that CEHE was required "in effect" to pay money to the United States, or (2) the United States violated any law by requiring the payment.

CEHE alleges that Education required CEHE to pay students an amount equal to the HCM2 funds subsequently demanded by CEHE, and so Education "compelled CEHE to bear the costs that the Department had a duty to bear."  Complaint, ¶ 258.  However, CEHE has failed to plausibly allege that Education required CEHE to make any payment to any student.  Unlike *Aerolineas*, there was no regulation or administrative action requiring CEHE to make any payment.  CEHE has failed to plausibly allege any Government action forcing CEHE to make any payment to any student.

Even assuming for the sake of argument that Education required CEHE to make payments for the benefit of the United States, CEHE has failed to plausibly allege any violation of law.  CEHE cites three statutes and one regulation, but makes no plausible allegation that any of these statutes, or the regulation, was violated.  *See* Complaint, ¶ 255 ("20 U.S.C. §§ 1070a, *Id.* at 1087b(c); *Id.* at 1226a-1; 34 C.F.R. § 668.162").  None of these statutes, nor the regulation, have been violated by any Government action alleged by CEHE.

The three statutes grant discretion to Education.  In relevant part, section 1070a(e) merely states that payments for Pell grants "shall be made in accordance with regulations promulgated by the Secretary."  Section 1087b(c) says that loan funds shall be paid "in a manner that is consistent with payment and delivery of Federal Pell Grants."  Section 1226a-1, states, in its entirety:

> Payments pursuant to grants or contracts under any applicable program may be made in installments, and in advance or by way of reimbursement, with necessary adjustments on account of overpayments or underpayments, as the Secretary may determine.

20 U.S.C. § 1226a-1.  In summary, none of the statutes cited by CEHE mandate the payment of any specific amounts of money to CEHE at any specific time.

Similarly, the regulation cited by CEHE states, in relevant part, that the "Secretary has sole discretion to determine the method" of paying an institution.  34 C.F.R. § 668.162(a).  The regulation further states that "the Secretary may modify the documentation requirements and review procedures use to approve the reimbursement request" made pursuant to the heightened cash monitoring payment method."  34 C.F.R. § 668.162(d)(2).  No part of the regulation can be reasonably interpreted to require any particular payment at any particular time.

The complaint fails to make any plausible allegation that Education violated any statute or regulation by failing to pay CEHE any amount of HCM2 funds by any specific date.  Indeed,

the complaint *fails to allege that CEHE even followed Education's instructions* concerning how to seek a payment for HCM2 funds after a school has closed. *Compare* Complaint Doc 1-24, at 3 (letter from Education to CEHE, dated August 4, 2021, explaining how to request payment) *with id.* ¶¶ 1-259.

In the alternative, we seek summary judgment upon the grounds that CEHE cannot demonstrate a genuine issue of material fact with regard to each essential element of its claim.

VI.    <u>CEHE Has Failed To Allege Any Violation Of Any Fiduciary Duty</u>

In general, this Court lacks jurisdiction to consider a claim for breach of a fiduciary duty because such a claim sounds in tort. *Newby v. United States,* 57 Fed. Cl. 283, 293-294 (2003); 28 U.S.C. § 1491. However, there is narrow exception where Congress has expressly created a trust relationship, and the statutory provisions are reasonably interpreted as mandating the payment of money for the breach of a fiduciary duty created by statute. *Compare Mitchell I,* 445 U.S. at 540-546 (1887 statute expressly created a trust, but imposed no duty to manage timber resources; no jurisdiction to consider a claim for mismanaging timber resources premised upon violating the 1887 Act alone) *with United States v. Mitchell,* 463 U.S. 206, 219-227 (1983) (*Mitchell II*) (jurisdiction to consider claim for mismanaging timber resources based upon statutes expressly creating a trust, and expressly requiring the Government to manage timber resources in specific ways, and for the benefit of the trustees).

In this case, CEHE seeks to require Education to immediately return its financial guarantee upon a breach of fiduciary duty theory. Complaint, ¶¶ 231-238. However, CEHE has failed to allege any statute or regulation that both establishes a trust relationship and states an obligation of the United States to manage the trust for the benefit of a person like CEHE.

The relevant statutes merely authorize Education to require institutions to provide financial guarantees as a condition of eligibility to participate in the spending programs – including a guarantee sufficient to assure that the institution can "meet all of its financial obligations, including (but not limited to) refunds of institutional charges and repayments to the Secretary for liabilities and debts incurred in programs administered by the Secretary."  20 U.S.C. § 1099c(c)(1)(C); 20 U.S.C. § 1099c(c)(3) (authority to require financial guarantee as a condition of eligibility); 20 U.S.C. § 1099c(e) (authority to require guarantee from owner of institution).

Even assuming for the sake of argument that the statutes create a trust relationship between Education and any institution that provides a guarantee, the statutes clearly do not create a fiduciary duty that the United States manage the funds for the benefit of the institution.  To the contrary, the statutes expressly provide that the financial guarantee is for the purpose of protecting students and the United States from financial loss.  20 U.S.C. § 1099c(c)(1)(C); 20 U.S.C. § 1099c(c)(3); 20 U.S.C. § 1099c(e).  Accordingly, CEHE's breach of fiduciary duty claim must be dismissed for lack of jurisdiction.  *Mitchell I,* 445 U.S. 542 ("only a limited trust relationship" where no duty to manage timber resources for the benefit of the tribe was expressed); *Newby v. United States,* 57 Fed. Cl. at 293-294 (fiduciary duty claim dismissed for lack of jurisdiction); 28 U.S.C. § 1491 (no jurisdiction to consider claims sounding in tort).

Even assuming for the sake of argument that some fiduciary duty jurisdiction may exist, CEHE has failed to state a plausible claim upon which relief may be granted.

CEHE contends that Education breached its fiduciary duty by not immediately refunding CEHE's financial guarantee on March 5, 2021.  *Id.* ¶ 235 (breach "upon the expiration of the Escrow Agreement"); *see id.* ¶ 59 (Education required to return escrow funds on March 5, 2021);

*id.,* ¶ 243 ("When CEHE timely submitted its FYE 2020 audit submission, the Department has

no legitimate statutory, regulatory or contractual basis to hold the escrow funds.").  However,

CEHE has failed to identify any statutory or regulatory requirement for Education to release

CEHE from its financial guarantee immediately on March 5, 2021.

Furthermore, undisputed facts demonstrate that the immediate return of CEHE's financial

guarantee on March 5, 2021 would have been inconsistent with the express purposes of the

statute requiring financial guarantees.  *E.g.,* 20 U.S.C. § 1099c(c)(1)(C) ("meet all of its financial

obligations, including (but not limited to) refunds of institutional charges and repayments to the

Secretary for liabilities and debts incurred in programs administered by the Secretary.").  On

March 5, 2021, CEHE had provided a financial guarantee of $20,877,279.[6]  By March 5, 2021,

CEHE had already closed one school, and had already lost its accreditation for at least one other

school.[7]  The possibility that CEHE's remaining schools might lose eligibility to participate in

the student aid programs (because of the lost accreditation) was obvious, as was the possible

need for Education to use some, or all, of CEHE's financial guarantee to meet anticipated

liabilities.  *See id.* ¶ 148 (CEHE began closing its remaining schools on April 22, 2021); *id.* Doc

---

[6] On December 19, 2018, Education issued four provisional program participation agreements, and each required a financial guarantee "of at least 10% of the Title IV, HEA program funds received by the institution during the last fiscal year."  A119, A136, A153, A170. On May 20, 2020, Education sent CEHE a letter that revised the ten percent calculation to $20,877,279, Complaint, Doc 1-12, at 2.  On May 29, 2020, Education signed three provisional program participation agreement containing the same ten percent security guarantee requirement, but mistakenly stating the earlier calculation of the ten percent amount.  A212, A230, A248. CEHE placed in escrow an amount equal to the revised (larger) ten percent calculation made on May 20, 2020.  Complaint, ¶ 236.

[7] On June 16, 2020, CollegeAmerica Denver notified its students that the institution was closing.  A264.  In February 2021, CEHE lost accreditation for at least one of its schools. Complaint, ¶ 141; *see id.* Doc 1-19 (Education determined that loss of accreditation increased financial risks); *id.* Doc 1-20 (same).  On March 5, 2021, CEHE submitted its Fiscal Year 2020 audit submission.  Complaint, ¶ 59.

1-19 (in a letter to CEHE, dated April 28, 2021, Education recognized increased financial risks associated with CEHE's loss of accreditation); *id.* Doc 1-20 (same).

In summary, Education's decision not to immediately return CEHE's financial guarantee on March 5, 2021 was consistent with Education's statutory obligations to protect the financial interests of students and the United States. *E.g.,* 20 U.S.C. § 1099c(c)(1)(C) ("meet all of its financial obligations, including (but not limited to) refunds of institutional charges and repayments to the Secretary for liabilities and debts incurred in programs administered by the Secretary."). Education did not violate any fiduciary duty by not immediately returning the financial guarantee to CEHE on March 5, 2021. Indeed, Education might have violated its statutory responsibilities to protect the financial interests of students and the United States if CEHE had immediately returned the financial guarantee to CEHE on March 5, 2021.

CEHE has failed to plausibly allege that Education had any fiduciary duty to release CEHE from its financial guarantee on March 5, 2021, and so its fiduciary duty claim should be dismissed for failure to state a claim upon which relief may be granted.

In the alternative, we seek summary judgment upon the grounds that CEHE cannot demonstrate a genuine issue of material fact with regard to each essential element of its claim.

<u>CONCLUSION</u>

For the reasons set forth above, we respectfully request that the complaint be dismissed. In the alternative, we respectfully request that our motion for summary judgment be granted.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

- 46 -

|                          | s/ Elizabeth M. Hosford |
| OF COUNSEL               | ELIZABETH M. HOSFORD |
|                          | Assistant Director |

STEVEN FINLEY                  s/ James W. Poirier
RAZIYA BRUMFIELD      JAMES W. POIRIER
Department of Education     Trial Attorney
                                   Commercial Litigation Branch
                                   Civil Division
                                   Department of Justice
                                   PO Box 480
                                   Ben Franklin Station
                                   Washington, D.C. 20044
                                   Tele:  202-598-7547
                                   Fax:   202- 305-7644
                                   james.poirier@usdoj.gov

March 24, 2023                  Attorneys for Defendant