**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CENTER FOR EXCELLENCE IN HIGHER EDUCATION, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 22-1732C |
| THE UNITED STATES, | ) ) | (Senior Judge Smith) |
| Defendant. | ) | |

**JOINT PRELIMINARY STATUS REPORT**

Pursuant to paragraphs 4 and 5 of Appendix A of the Rules of the United States Court of Federal Claims  ("RCFC"), plaintiff, Center for Excellence in Higher Education, Inc. (CEHE), and defendant, the United States, respectfully submit the following Joint Preliminary Status Report.

1.      **Requirements of Appendix A, Paragraph 4**

   **a.  Does the court have jurisdiction over the action?**

The parties agree that the Court possesses jurisdiction to consider CEHE's takings and illegal exaction claims.

Plaintiff states that this Court has jurisdiction to hear Counts I through IV pursuant to 28 U.S.C. § 1491(a)(1) because the claims arise from various contracts with the United States.

Defendant states that the Court lacks jurisdiction to consider claims other than the takings and illegal exaction claims for several reasons.  *See* Motion To Dismiss, March 24, 2023, ECF No. 12; Def. Reply, August 15, 2023, ECF No. 25.  However, the Court has denied our motion to dismiss the contract claims for lack of jurisdiction.  Order, March 12, 2024, ECF No. 35.  It is ambiguous whether the Court dismissed our motion to dismiss the breach of fiduciary duty claim because it sounds in tort.  *Id.*

**b.      Should this case be consolidated with any other case and, if so, why?**

No.

**c.      Should trial of liability and damages be bifurcated and, if so, why?**

No.  The parties agree that any trial should include both issues of liability and issues of damages.

**d.      Should further proceedings in the case be deferred pending consideration of another case before this court or any other tribunal and, if so, why?**

No.

**e.      In cases other than tax refund actions, will a remand or a suspension be sought and, if so, why and for how long?**

No.

**f.      Will additional parties be joined?  If so, the parties shall provide a statement describing such parties, their relationship to the case, the efforts to effect joinder, and the schedule proposed to effect joinder.**

No additional parties will be joined.

**g.      Does either party intend to file a motion pursuant to RCFC 12(b), 12(c), or 56 and if so, what is the schedule for intended filing?**

Plaintiff's Statement:

Subject to discovery and further factual development, CEHE intends to file a motion for summary judgment under Rule 56 on the issues of whether various agreements in this case are valid and enforceable contracts. Such motion will be filed at the close of discovery, and within the deadlines outlined in the Joint Discovery Plan, below.  CEHE reserves the right to seek summary judgment under Rule 56 on other issues should it become appropriate based on information obtained in discovery.

Plaintiff also request that each party be limited to filing one motion under Rule 56 to avoid the unnecessary cost and delay caused by piecemeal litigation.

<u>Defendant's Statement:</u>

The United States anticipates filing a motion for summary judgment promptly on all contract claims because CEHE cannot demonstrate that any contract exists.  We anticipate a focus upon the issue of authority to enter into contracts.

In earlier briefing, CEHE responded to our motion for summary judgment challenging CEHE's ability to demonstrate the elements of contract with a motion for discovery, pursuant to RCFC 56(d).  Response, at 39 n.14, July 7, 2023, ECF No. 18.  We withdrew our motion for summary judgment in the wake of CEHE's discovery demand in order to simplify the issues before the Court.  *See* Reply, at 1, August 15, 2023, ECF No. 25.

The Court found CEHE's allegations of contracts (including reasonable inferences in favor of CEHE) sufficient to survive a motion to dismiss, but also noted insufficient information about necessary facts.  Order, at 2, March 12, 2024, ECF No. 35.  We are mindful of the need to address the Court's concerns.  As part of our initial disclosures, we will soon disclose witnesses from Education's contracting offices with knowledge of contracting authority, and we intend to gather relevant records and voluntarily produce these records to CEHE.

An early consideration of our motion for summary judgment is in the interests of justice and judicial economy.  CEHE has turned challenges to Education's administrative actions into allegations that more than a dozen contracts were breached by administrative actions over the course of decade, and CEHE seeks more than $500 million in damages.  The contracting authorities and program administration authorities at Education are starkly separate, and can easily be established as separate.  By addressing this issue soon, the parties can avoid an

unfocused review of Education's administrative actions over the course of a decade.

      **g.**     **What are the relevant factual and legal issues?**

Plaintiff's Statement:

      CEHE's factual allegations and claims are set forth in its Complaint (ECF 1). CEHE's statements below are intended to provide a brief summary of those claims and the primary legal and factual issues raised in those claims.  These statements are not intended to be exhaustive, and CEHE reserves the right to pursue any factual or legal matter properly raised in its pleadings.

**Count I – Breach of Contract**

      The Department of Education ("Department") and CEHE entered into various Program Participation Agreements ("PPAs") setting the terms and conditions of CEHE's colleges' participation in federal student aid programs under Title IV of the Higher Education Act ("Title IV").  The PPAs incorporates all Title IV regulations and statutes by reference, including the requirement that the Department fund students' claims for Title IV funding.

      On April 28, 2021, the Department notified CEHE via two letters that CEHE would be placed on heightened cash monitoring 2 status ("HCM2"), which required CEHE to advance all Title IV funding to its students and then seek reimbursement from the Department upon proof that the students were eligible.  The two letters ("HCM2 Letters") promised CEHE that if CEHE funded Title IV disbursements to its eligible students, the Department would reimburse CEHE for those disbursements.

      In accordance with the PPA and HCM2 letters, CEHE advanced Title IV funds to its students on behalf of the Department and subsequently provided sufficient proof of each student's eligibility for the funds.  The Department, however, wrongfully and intentionally withheld the reimbursement funds without a legitimate basis.

*Legal and Factual Issues (Count I):*

1.  Are the PPAs and HCM2 letters valid and enforceable contracts?

2.  Do the PPAs and HCM2 letters impose contractual obligations on the Department requiring it to reimburse CEHE for the Title IV funds CEHE disbursed to its students on the Department's behalf?

3.  Were the students who received Title IV disbursements that were funded by CEHE eligible for those disbursements?

4.  Did the Department have a legitimate basis to conclude that those students were not eligible for the Title IV disbursements paid by CEHE?

5.  What are the damages CEHE suffered as a result of the Department's failure to reimburse CEHE for the Title IV funds CEHE disbursed to students on the Department's behalf?

**Count II – Breach of Contract (duty of good faith and fair dealing)**

All government contracts contain an implied covenant of good faith and fair dealing. Because the PPA's and HCM2 letters are valid and enforceable contracts, CEHE alleges that the Department, among other things, withheld consideration of, and eventually denied, CEHE's valid HCM2 reimbursement requests with the intention of starving CEHE of money and forcing its precipitous closure. The Department also acted to prevent CEHE from entering teach-out agreements with other institutions in order to prevent students from completing their programs, thereby creating a basis to grant closed-school discharges. Moreover, the Department improperly influenced students to abandon their programs and seek closed school discharges rather than continue their programs elsewhere, creating more opportunities to discharge student loans.

*Legal and Factual Issues (Count II):*

1.   Are the PPAs and HCM2 letter valid and enforceable contracts?

2.   Did the PPAs and HCM2 letters contain implied covenants of good faith and fair dealing?

3.   Did the Department breach the PPAs' and HCM2 Letters' implied covenants of good faith and fair dealing by, among other things, withholding consideration and approval of CEHE's HCM2 reimbursement requests?

4.   Did the Department breach the PPAs' and HCM2 Letters' implied covenants of good faith and fair dealing by, among other things, acting to prevent CEHE from entering teach-out agreements with other institutions?

5.   Did the Department breach the PPAs' and HCM2 Letters' implied covenants of good faith and fair dealing by, among other things, influencing students to abandon their programs rather than continue their educations at another institution?

6.   What are the damages CEHE suffered as a result of the Department's breaches of the PPAs' and HCM2 letters' implied covenants of good faith and fair dealing?

**Count III – Breach of Contract (Escrow Agreement)**

On or about June 8, 2015, the Department entered an escrow agreement with CEHE ("Escrow Agreement") by which the CEHE agreed to post $49.9 million in escrow funds, which the Department could use for specified purposes during the term of the agreement, in exchange for continued authorization to participate in Title IV programs. The Escrow Agreement sets forth the terms under which the Department would hold CEHE's funds in escrow. Those terms included, among other things, the requirement that the Department release the funds by a date certain, unless the Department notified CEHE in advance of a basis to extend the term of the agreement. Over the years, the Department and CEHE agreed to modify the amount held in

escrow as well as the expiration date of the agreement. Most recently, in May 2020, the Department and CEHE agreed to modify the escrow amount to $20,877,279, and the Department expressly confirmed that it would release the escrow funds no later than two weeks after CEHE submitted its financial audit for the fiscal year ending 2020 and the audit was accepted by the Department's eZ-Audit system. CEHE timely submitted the audit on March 5, 2021, which was accepted by the eZ-Audit system.  The Department did not notify CEHE of any basis to extend the term of the Escrow Agreement.  Nonetheless, the Department has refused to return any portion of the $20,877,279 of CEHE's funds.

*Legal and Factual Issues (Count III)*:

1.   Is the Escrow Agreement, as modified by the Parties in subsequent letters, a valid and enforceable contract?

2.   Did the Escrow Agreement require the Department to release CEHE's funds within two weeks after CEHE's FYE 2020 audit was accepted by the eZ-Audit system?

3.   Did the Department breach the Escrow Agreement by refusing to release CEHE's escrow funds within two weeks after CEHE's FYE 2020 audit was accepted by the eZ-Audit system?

4.   What are the damages CEHE suffered as a result of the Department's breach of the Escrow Agreement?

**Count IV – Breach of Fiduciary Duty**

As holder of CEHE's escrow funds pursuant to the Escrow Agreement, the Department owed CEHE fiduciary duties with respect to the escrow funds.  Those fiduciary duties included the requirement to strictly comply with the terms of the Escrow Agreement.  As discussed above, the Department failed to adhere to the terms of the Escrow Agreement by, among other things,

refusing to release the funds to CEHE when the Escrow Agreement expired.

*Legal and Factual Issues (Count IV):*

1.   Did the Department owe fiduciary duties to CEHE as holder of CEHE's escrow funds?

2.   Did the Department's fiduciary duties arise from the Escrow Agreement?

3.   Did the Department's fiduciary duties require it to strictly comply with the terms of the Escrow Agreement?

4.   Did the Department breach its fiduciary duties by continuing to hold CEHE's escrow funds after the expiration of the Escrow Agreement?

5.   What are the damages CEHE suffered as a result of the Department's breaches of its fiduciary duties?

**Count V – Improper Taking Under the Fifth Amendment (Escrow Funds)**

When the Escrow Agreement expired, CEHE had a vested right to immediate return of the escrow funds.  The Department has no legal basis to assert any liability or right or claim to those funds. To the extent the Department has some basis to repurpose CEHE's escrow funds as security for liabilities that may become due and payable in the future, that would directly infringe on CEHE's vested right to the funds now.

*Legal and Factual Issues (Count V):*

1.   Does CEHE have a vested right to the immediate return of the escrow funds?

2.   Does the Department have a legitimate basis to deny CEHE's right to immediate possession of the escrow funds?

3.   Does the Department's retention of the escrow funds amount to a taking in violation of the Fifth Amendment?

4.   Is CEHE entitled to just compensation for the Department's taking of CEHE's escrow funds, and, if so, how much?

**Count VI – Improper Taking Under the Fifth Amendment (HCM2 Funds)**

The Department's regulations, statutes, and the PPAs require the Department to reimburse CEHE for all funds CEHE properly disbursed to its students on the Department's behalf. While CEHE was on HCM2 status, CEHE properly disbursed funds to its students ("HCM2 Funds). Accordingly, CEHE has a vested statutory, regulatory, and contractual right to reimbursement of the HCM2 funds. To the extent the Department has some basis to repurpose the HCM2 funds as security for liabilities that may become due and payable in the future, that would directly infringe on CEHE's vested right to the funds now.

*Legal and Factual Issues (Count VI)*:

1.   Does CEHE have a vested right to the immediate return of the HCM2 funds?

2.   Does the Department have a legitimate basis to deny CEHE's right to immediate possession of the HCM2 funds?

3.   Does the Department's retention of the HCM2 funds amount to a taking in violation of the Fifth Amendment?

4.   Is CEHE entitled to just compensation for the Department's taking of CEHE's HCM2 funds, and, if so, how much?

**Count VII – Illegal Exaction**

The Higher Education Act and its implementing regulations require the Department to pay eligible institutions such sums as may be necessary to pay each eligible student the amount of Title IV funding for which that student is eligible. By refusing to reimburse CEHE for the HCM2 funds, the Department forced CEHE to pay costs that were the Department's legal duty to bear.

The Department exceeded its authority under the Higher Education Act, Title IV regulations, and the terms of the PPA by refusing to reimburse CEHE's HCM2 payments. Accordingly, it has money in its pocket that corresponds to payments that were the Department's statutory obligation.

*Legal and Factual Issues:*

1.      Was the Department required to pay CEHE the funds necessary to pay eligible students for the Title IV funds for which they were eligible?

2.      Did CEHE properly disburse Title IV funds to those students on the Department's behalf?

3.      Was the Department legally required to reimburse CEHE for those funds?

4.      Did the Department have a legal basis to refuse to reimburse CEHE for the those funds?

5.      What is the amount CEHE is entitled to recover based on the Department's illegal exaction of the funds?

Defendant's Statement:

Fact Issues

1.      Did Congress enact statutes requiring schools seeking to participate in certain Federal student aid programs ("Title IV programs) to make applications to the Department of Education (Education)?

2.      Did CEHE submit an application to Education to participate in the Title IV programs?

3.      Did Congress enact statutes granting Education discretion to approve an application, or to disapprove an application, or to approve an application subject to certain conditions?

4.      Did Congress enact statutes granting Education discretion to monitor the performance of schools eligible to participate in Title IV programs, and to revoke or place conditions on continued eligibility?

5.      In 2016, did CEHE challenge Education's exercise of its regulatory authority in a suit filed pursuant to the Administrative Procedures Act in the United States District Court for the District of Utah?

6.      Did Education issue eligibility certifications to CEHE in response to CEHE's application for eligibility to participate in Title IV programs?

7.      Are some eligibility certifications called temporary provisional program participation agreements while other eligibilty certifications are called provisional program participation agreements and program participation agreements?

8.      Did Education issue eligibility certifications to CEHE in order to procure services from CEHE?

9.      Did CEHE's application for eligibility to participate in Title IV programs offer any price for any services to be performed by CEHE?

10.      Did any employee of Education who approved the issuance of any eligibility cerification to CEHE, or the modification of any eligibility cerification issued to CEHE, have a contracting officer's warrant?

11.      Does Education employ contracting officers who procure goods and services in support of the Title IV programs?

12.      Do contracting officers at Education who procure goods and services in support of the Title IV programs issue solicitations and award contracts in accordance with the Federal Acquisition Regulation (FAR) and Education's supplement to the FAR (EDAR)?

13.     Do contracting officers at Education who procure goods and services in support of the Title IV programs modify and terminate contracts in accordance with the FAR and EDAR?

14.     Was any eligibility certification issued to CEHE pursuant to procedures and criteria required by the FAR and EDAR?

15.     Was any eligibility certification issued to CEHE modified pursuant to procedures and criteria required by the FAR and EDAR?

16.     Was any eligibility certification issued to CEHE terminated pursuant to procedures and criteria required by the FAR and EDAR?

17      Did any contracting officer at Education participate in the review of CEHE's request to change its program participation status from "for profit" status to "nonprofit" status?

18.     Did the Carl Barney Living Trust sell four schools to CEHE in December 2012 in exchange for cash and debt, as a way to strip the cash out of those schools and to turn future profits at those schools into funds needed to service debt payments to the Carl Barney Living Trust?

19.     Did the transaction between the Carl Barney Living Trust and CEHE result in CEHE's failure to meet Education's regulatory requirements for financial responsibility, and so cause Education's determination that CEHE must provide a financial guaranty as a condition for continued eligibility to participate in Title IV programs?

20.     Has Education every determined that CEHE met all financial responsibility requirements for participation in Title IV programs?

21.     In May 2015, did Education agree to reduce the financial guaranty requirement for CEHE's continued participation in Title IV programs to less than $43 million?

22.     Subsequent to May 2015, did Education regularly review CEHE's financial

condition pursuant to statutory and regulatory authorities?

23.     Was CEHE placed on probation by its accreditor in 2018?

24.     In 2018, subsequent to regulatory review procedures, did Education reduce the financial guaranty that CEHE was required to provide as a condition of its eligibility certification to less than $17 million?

25.     Was any determination concerning CEHE's abililty to meet financial responsibility requirements made by a contracting officer at Education following procedures required by the FAR and EDAR?

26.     Was some of the money that CEHE had deposited as a financial guaranty returned to CEHE by Education following a regulatory review of CEHE's financial condition and a regulatory determination that the financial guaranty condition of eligibility to participate in Title IV programs should be reduced?

27.     Was money that CEHE had deposited as a financial guaranty returned to CEHE by a contracting officer at Education following procedures required by the FAR and EDAR?

28.     In 2020, subsequent to regulatory review procedures, did Education increase the financial guaranty that CEHE was required to provide as a condition of its eligibility certification to more than $20 million?

29.     Following Education's regulatory determination in 2020, did CEHE deposit additional funds to meet the financial guaranty requirement that was a condition of CEHE's eligibility to participate in Title IV programs?

30.     Did CEHE announce in June 2020 that one of its schools, CollegeAmerica Denver, would close in September 2020?

31.     Did CEHE lose its probationary accreditation for remaining schools in February 2021?

32.     Did Education determine that the regulatory option to pay CEHE using the HCM2 payment method was appropropriate in light of increased financial risks associated with CEHE's loss of accreditation?

33.     Did Education open an unannounced program review on June 1, 2021 to evaluate CEHE's compliance with Title IV program requirements?

34.     Did Education reject CEHE's initial HCM2 submission due to deficiencies found in the sample student files reviewed?

35.     Did any contracting officer at Education participate in the review of CEHE's HCM2 submission?

36.     What costs (if any) were incurred when CEHE credited accounts in 2021 for students after CEHE's schools were placed on HCM2 method of payment?

37.     Did CEHE announce to Education in July 2021 that CEHE wold close its remaining schools?

38.     Did Education provide notice to CEHE of requirements for submitting a final HCM2 payment request after closure of its institutions?

39.     Did CEHE submit a complete final HCM2 payment request in accordance with the instructions and requirements prescribed in the close-out audit reminder letter?

40.     Is Education engaged in regulatory reviews to determine amounts owed by CEHE to the United States in connection with Title IV programs?

41.     Is any contracting officer at Education participating in the regulatory reviews to determine amounts owed by CEHE to the United States in connection with Title IV programs?

42.     What is the amount that CEHE owes to the United States in connection with CEHE's participation in Title IV programs?

Legal Issues

1.      Was any eligibility certification issued to CEHE issued by a contracting officer at Education, or other person at Education with contracting authority?

2.      Did any eligibility certification issued to CEHE constitute a service contract?

3.      Do the various decisions by Education to impose financial guaranty requirements as conditions of CEHE's continued eligibility to participate in Title IV programs constitute final agency actions subject to review in United States District Court pursuant to the Administrative Procedures Act?

4.      Were any of the various decisions by Education to impose financial guaranty requirements as conditions of CEHE's continued eligibility to participate in Title IV programs made by a contracting officer at Education, or other person at Education with contracting authority?

5.      Were any of the various decisions by Education to impose financial guaranty requirements as conditions of CEHE's continued eligibility to participate in Title IV programs made pursuant to procedures and criteria required by the FAR and EDAR?

6.      Did Education's decision to pay CEHE using the HCM2 payment method constitute final agency action subject to judicial review in United States District Court pursuant to the Administrative Procedures Act?

7.      Was Education's decision to pay CEHE using the HCM2 payment method a contract modification executed by a contracting officer?

8.      Will the regulatory reviews to determine amounts owed by CEHE to the United States in connection with Title IV programs now underway at Education culminate in final agency action subject to judicial review in United States District Court pursuant to the Administrative Procedures Act?

9.      Does this Court possess jurisdiction to interfere with regulatory reviews at Education to determine amounts owed by CEHE to the United States in connection with Title IV programs?

10.      Assuming *arguendo* that the Court possesses jurisdiction, what is the amount that CEHE owes to the United States in connection with CEHE's participation in Title IV programs?

11.      Will the regulatory determination concerning whether to draw against CEHE's financial guaranty be final agency action subject to judicial review in United States District Court pursuant to the Administrative Procedures Act?

12.      Does this Court possess jurisdiction to consider Education's regulatory determination concerning whether to draw against CEHE's financial guaranty?

13.      Assuming *arguendo* that the Court possesses jurisdiction, what is the amount that Education should draw against CEHE's financial guaranty?

14.      When Education makes a regulatory determination concerning the amount of money owed to CEHE pursuant to the HCM2 payment method, will that decision constitute final agency action subject to judicial review in United States District Court pursuant to the Administrative Procedures Act?

15.      Assuming *arguendo* that the Court possesses jurisdiction, what amount, if any, is the United States legally required to reimburse to CEHE for money credited to the accounts of students by CEHE in 2021, after being placed on HCM2 method of payment?

16.     Assuming *arguendo* that the Court possesses jurisdiction, what amount of compensatory damages is CEHE entitled to for breaches of Education's obligations under the eligibility certifications?

17.     Assuming *arguendo* that the Court possesses jurisdiction, what amount of consequential damages is CEHE entitled to for breaches of Education's obligations under the eligibility certifications?

**i.      What is the likelihood of settlement?  Is alternative dispute resolution contemplated?**

Plaintiff is open to settlement, but it does not seem likely in the short term.  The Parties have not meaningfully discussed settlement or alternative dispute resolution, and Defendant's position seems to foreclose settlement discussions at this time. Plaintiff is willing to revisit settlement in the future as discovery progresses.

Defendant's position is that settlement is not likely.  Alternative dispute resolution is not contemplated.

**j.      Do the parties anticipate proceeding to trial?  Does either party, or do the parties jointly, request expedited trial scheduling, and, if so, why?  The requested place of trial shall be stated.  Before such a request is made, the parties shall confer specifically on this subject.**

The parties anticipate proceeding to trial in Washington D.C.  Neither party seeks expedited scheduling for trial.

**k.      Are there special issues regarding electronic case management needs?**
No.

**l.      Is there other information of which the court should be aware at this time?**
No.

2.      **Appendix A, Paragraph 5**

          **Joint Proposed Discovery Plan**

July 8, 2024                    Initial Disclosures deadline

August 29, 2025              Completion of fact discovery

October 3, 2025              Expert reports deadline

November 7, 2025          Expert rebuttal reports deadline

December 12, 2025         Completion of expert discovery

January 13, 2026            Deadline to file dispositive motions

                                        Respectfully submitted,

                                        Brian M. Boynton
                                        Principal Deputy Assistant Attorney General

                                        Patricia M. McCarthy
                                        Director

/s/ Steven M. Gombos_____        /s/ Elizabeth M. Hosford___
STEVEN M. GOMBOS                      ELIZABETH M. HOSFORD
DAVID A. OBUCHOWICZ (Of Counsel)    Assistant Director
Gombos Leyton, P.C.
11350 Random Hills Road              /s/ James W. Poirier_____
Suite 400                            JAMES W. POIRIER
Fairfax, VA 22030                    Trial Attorney
Tel: 703-934-2660                    Commercial Litigation Branch
Fax: 703-934-9840                    Civil Division
sgombos@glpclaw.com                  Department of Justice
dobuchowicz@glpclaw.com              PO Box 480
                                     Ben Franklin Station
Attorneys for Plaintiff              Washington, D.C. 20044
                                     Tel.: 202-598-7547
                                     Fax: 202-305-7644
                                     james.poirier@usdoj.gov

                                     Attorneys for Defendant

June 17, 2024